**SOUTHMARK CORPORATION,**
Plaintiff–Appellant,

v.

**LIFE INVESTORS, INC., and USLICO**
Corporation, Defendants–Appellees.

No. 87–1353.

United States Court of Appeals,
Fifth Circuit.

Aug. 11, 1988.

Charles L. Babcock, Jack Pew, Jr., Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for plaintiff-appellant.

David Klingsberg, Kaye, Scholer, Fierman, Hays & Handler, Mark R. Weiss, New York City, Hughes & Luce, Eric R. Cromartie, Dallas, Tex., for Life Investors, Inc.

Robert E. Gerber, Debra M. Torres, Fried, Frank, Harris, Shriver & Jacobson, New York City, Morris Harrell, Timothy W. Mountz, Rain, Harrell, Emery, Young & Doke, Dallas, Tex., for USLICO Corp.

Before GARWOOD and JONES, Circuit Judges, and BLACK*, District Judge.

GARWOOD, Circuit Judge:

In this Texas diversity case, plaintiff-appellant Southmark Corporation (Southmark) appeals the district court's summary judgment that Southmark take nothing against defendant-appellee Life Investors, Inc. (Life) and its dismissal of Southmark's suit against USLICO Corporation (USLICO). We affirm in all respects, except that the wording of the judgment of dismissal of the action against USLICO is modified to reflect that it is a dismissal for lack of *in personam* jurisdiction.

### Facts and Proceedings Below

Prior to the transactions that gave rise to this suit, Life[1] and General George Olmsted (Olmsted) of Arizona owned a controlling share of stock in International Bank (IB), an Arizona corporation. Olmsted owned approximately forty-one percent of the outstanding IB stock and Life owned approximately twenty-two percent. In November 1984, Life and Olmsted signed a Memorandum of Understanding in which Life agreed that if it wished to sell its IB stock, it would first offer the stock to Olmsted.[2] Olmsted would then have thirty

---

* District Judge of the Southern District of Texas, sitting by designation.

1. Life is an insurance holding company organized and existing under the laws of Iowa. Approximately eighty-one percent of Life's stock is owned indirectly by AEGON, a holding company organized and existing under the laws of The Netherlands. AEGON holds the Life stock through two wholly owned subsidiaries, AGO International B.V. of The Netherlands, and Fiago, Inc., a corporation organized and existing under the laws of New York. Until October 10, 1985, Life and AEGON together owned 797,774 shares of common stock and 4,187,676 shares of Class A common stock of IB. In this appeal, Life need not be differentiated from AEGON, and for the sake of simplicity we will refer to both Life and AEGON as "Life."

2. The Memorandum of Understanding agreement states in relevant part:

"1. George Olmsted ('General Olmsted') hereby grants Aegon, N.V. and Life Investors, Inc. ('Aegon') a right of first offer on his shares of International Bank, and Aegon hereby grants a similar right to him on its IB shares.

" . . . .

days in which to accept the offer. If Olmsted did not accept, Life would then have ninety days in which to sell the stock to any third party at a price equal to or higher than the price offered to Olmsted.

In early 1985, Southmark began negotiating with Life for the sale of Life's IB stock as well as its stock in USLICO. Southmark contends that during the negotiations the two parties came to a meeting of the minds and formed a contract for the sale of the stock to Southmark. Life, on the other hand, contends that no meeting of the minds occurred and thus no contract was formed.

On May 2, 1985, however, Life sent a letter to Olmsted notifying him that Life had "received an unsolicited offer to buy all" of its IB shares and that Life "wish[ed] to sell" a specific number of those shares at a specified price.[3] The letter did not state the identity of the offeror or the party to whom Life wished to sell (nor did it expressly state that they were the same). Within the allowed thirty days, Olmsted accepted the offer and began attempts to close the transaction. During the summer of 1985, however, it became clear that Olmsted would not be financially able to purchase the shares. On August 22, 1985, Life signed a written agreement to sell its IB shares to USLICO. That transaction was closed in October 1985.

Southmark then brought suit against Life for breaching its alleged agreement to sell the IB stock to Southmark. Southmark joined USLICO as a defendant claiming that USLICO tortiously interfered with Southmark's alleged contract or prospective advantage with Life. Life moved for summary judgment arguing that any alleged agreement to sell securities to Southmark is unenforceable under Tex.Bus. & Com.Code Ann. § 8.319, which is the statute of frauds pertaining to the sale of investment securities.[4] To support its motion, Life argued that there were no writings indicating that the parties had actually entered into a contract for the sale of the stock. USLICO moved for dismissal on the basis of lack of personal jurisdiction over it.

To overcome the statute of frauds defense, Southmark produced two documents

"3. As to any IB shares which are owned by Aegon directly or by its subsidiaries, including Life Investors, Inc., if Aegon wishes to sell any of them it will give General Olmsted a similar notice, and he ... will have 30 days in which to give Aegon notice agreeing to buy all (but not part) of the shares it wants to sell, at the stated price. If General Olmsted does not give that notice within 30 days, Aegon will be free to sell the shares to any third party, at that price or more, for a period of 90 days."

**3.** Specifically, the letter to Olmsted stated:
"As we discussed in your office, AEGON and Life Investors have received an unsolicited offer to buy all of the International Bank shares owned by them. Pursuant to our Memorandum of Understanding, we notify you that we wish to sell an aggregate of 797,774 shares of Common Stock and 4,187,676 of Class A Common Stock for an aggregate purchase price of $57,332,675 (an average of $11.50 per share.)"
The letter then goes on to set forth the terms under which Life was prepared to accept payment of the purchase price from Olmsted.

**4.** Section 8.319, Tex.Bus. & Com.Code Ann., states in full:
"A contract for the sale of securities is not enforceable by way of action or defense unless:

"(1) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker, sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price;
"(2) delivery of a certificated security or transfer instruction has been accepted, or transfer of an uncertificated security has been registered and the transferee has failed to send written objection to the issuer within 10 days after receipt of the initial transaction statement confirming the registration, or payment has been made, but the contract is enforceable under this provision only to the extent of the delivery, registration, or payment;
"(3) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under Subdivision (1) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within 10 days after its receipt; or
"(4) the party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price."

signed by Life's representatives. One document was the 1984 Memorandum of Understanding in which Life agreed to give Olmsted a right of first offer on Life's shares of IB stock. The other document was the May 1985 letter in which Life informed Olmsted that it had received an unsolicited offer for the IB shares and that it wished to sell those shares at a specified price. According to Southmark, these documents, taken together, satisfy the statute of frauds by indicating that Life and Southmark had in fact entered into a contract for the sale of the IB securities. Southmark argued alternatively that Life should be estopped from asserting a statute of frauds defense because Life promised to execute final documents setting forth the terms of its alleged oral agreement with Southmark. With regard to USLICO's motion to dismiss, Southmark argued that its proof established that Texas courts had both specific and general jurisdiction over USLICO.

The district court rejected Southmark's contentions and granted Life's motion for summary judgment as well as USLICO's motion to dismiss. The district court found that the two documents produced by Southmark failed to satisfy the statute of frauds because neither document specifically referred to Southmark. Citing *Cohen v. McCutchin*, 565 S.W.2d 230 (Tex.1978), the court stated that a writing sufficient to meet the standards of a statute of frauds must be signed by the person to be charged and it must identify the other party to the transaction. Although Life's representatives signed the documents in question, neither document specifically mentions Southmark.

The court also found that Southmark's promissory estoppel claim was meritless because the evidence produced by Southmark did not raise a factual issue as to whether Life promised to sign a written contract. Relying on *Nagle v. Nagle*, 633 S.W.2d 796 (Tex.1982), the district court explained that a promise to prepare a written contract is not sufficient to overcome the statute of frauds under the doctrine of promissory estoppel; instead, there must be a showing that the defendant promised to sign a particular written agreement.

Finally, the district court found that USLICO's contacts with Texas were not sufficient to establish *in personam* jurisdiction and granted USLICO's motion to dismiss on this basis. However, the district court's final judgment ordered that Southmark take nothing against either defendant, thus in form being on the merits in favor of USLICO as well as Life. This appeal followed.

## Discussion

The issues raised on appeal are whether the district court properly granted Life's motion for summary judgment based on the statute of frauds defense, and whether the district court properly granted USLICO's motion to dismiss for lack of personal jurisdiction. We shall address these issues in turn.

### I. *The Statute of Frauds Defense*

■ The parties in this case agree that the alleged contract between Life and Southmark falls within the provisions of Tex.Bus. & Com.Code Ann. § 8.319. The question is whether the two documents produced by Southmark together satisfy the requirements of section 8.319. After reviewing the documents, we agree with the district court's conclusion that they do not.

Section 8.319 specifically provides that a contract for the sale of securities is unenforceable unless there is some writing signed by the party against whom enforcement is sought "sufficient to indicate that a contract *has been made*" for the sale of a stated quantity of described securities at a stated price. Tex.Bus. & Com.Code Ann. § 8.319(1) (emphasis added). The documents produced by Southmark, taken alone or read together, do not sufficiently indicate that a contract for the sale of the IB securities had in fact been made. Indeed, the Memorandum of Understanding merely provides that if Life wishes to sell the IB stock, it will notify Olmsted and give him an opportunity to purchase the same. The Memorandum of Understanding then states that if Olmsted chooses not to buy the shares, Life will be free

to sell the shares to any third party. Nothing in the Memorandum of Understanding indicates that Life must enter into a firm agreement with a prospective buyer before notifying Olmsted, nor does anything in it indicate that an offer for the shares must exist before Life can notify Olmsted of its desire to sell.[5] Furthermore, assuming a third party has made an offer, nothing in the Memorandum of Understanding indicates that Life must sell the shares to that third party in the event Olmsted chooses not to buy the shares within the prescribed time.

Likewise, the notification letter that Life sent to Olmsted in May 1985, even when read together with the Memorandum of Understanding, does not indicate that a contract had been made. The letter merely states that Life had received an offer to buy the IB stock and that pursuant to the Memorandum of Understanding Life was notifying Olmsted that it wished to sell the shares. The letter did not state that Life

had agreed to sell the stock to the party making the offer in the event Olmsted chose not to buy the stock; in fact, it did not even state that Life wished to sell the shares to the party making the offer.

At most, the two documents indicate that Life had received an offer for the shares and that it would consider accepting the offer if Olmsted elected not to purchase the stock. Under Texas law, however, a writing that contemplates a contract to be made in the future does not satisfy the requirements of the statute of frauds.[6] Indeed, it is common sense that "futuristic" language in a writing is "not confirmatory of a contract already in existence." See *Martco, Inc. v. Doran Chevrolet, Inc.,* 632 S.W.2d 927, 928–29 (Tex.App.—Dallas 1982, no writ), and cases cited therein. Since the two documents produced by Southmark do no more than indicate the possibility of a future contract, they clearly fail to meet the requirements of section 8.319.[7]

**5.** Southmark argues that the undisputed testimony of its president and chairman reflects that he was told by Life's executive vice president that under the Memorandum of Understanding, Life was to notify Olmsted of its desire to sell only if Life had a "bona fide agreement" for the sale of the shares and not just an offer. Thus, according to Southmark, the fact that Life notified Olmsted of its desire to sell is itself an indication that Life had a firm agreement for the sale of the IB securities. However, to satisfy the statute of frauds, a writing must be complete in itself so that the contract can be ascertained from the writings without resorting to oral testimony. See *Cohen v. McCutchin,* 565 S.W.2d 230, 232 (Tex.1978). Moreover, oral evidence cannot connect different writings for the purpose of satisfying the statute of frauds. See *Gruss v. Cummins,* 329 S.W.2d 496, 502 (Tex. App.—El Paso 1959, writ ref'd n.r.e.). Although these cases involve what is now Tex.Bus. & Com.Code Ann. § 26.01, which is the general statute of frauds, we think the same rule should apply in cases involving section 8.319. We have found no authority to the contrary, and we see no reason (nor is one urged) for applying different evidentiary rules with regard to these two statutes.

The *writings* in question, the Memorandum of Understanding and the May 1985 letter to Olmsted, do not *themselves,* singly or collectively, indicate that Life had made a contract to sell its IB stock. The mentioned Southmark theory thus fails because crucial to it is matter *dehors* any writing.

**6.** See *Micromedia v. Automated Broadcast Controls,* 799 F.2d 230, 234 (5th Cir.1986) (citing

*Martco, Inc. v. Doran Chevrolet, Inc.,* 632 S.W.2d 927, 928–29 (Tex.App.—Dallas 1982, no writ)). *Micromedia* and *Martco* both involve Tex.Bus. & Com.Code Ann. § 2.201(a), which is the statute of frauds governing contracts for the sale of goods over $500. Section 2.201(a) states in relevant part that:

"a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." The Uniform Commercial Code Comment following section 8.319 states specifically that section 8.319 is intended to conform the statute of frauds provisions with regard to securities to the policy of the provisions in Article 2 on the sale of goods. Thus, in light of this stated purpose, and in light of the fact that both section 8.319 and section 2.201 contain the "has been made" language, we think the rule articulated in *Micromedia* and *Martco* is controlling in this case as well.

**7.** Southmark correctly points out that Comment 1 to Tex.Bus. & Com.Code Ann. § 2.201 provides that "[a]ll that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." Noting that section 8.319 is intended to conform to the stated policies underlying section 2.201, Southmark contends that section 8.319 requires only that the writing provide a basis for believing that Southmark's oral evidence rests upon a

In reaching its own conclusion, the district court determined that the two documents produced in this case failed to overcome the statute of frauds because they did not identify Southmark. Relying upon *Cohen v. McCutchin*, 565 S.W.2d 230 (Tex. 1978), the district court determined that a writing sufficient to meet the requirements of the statute of frauds must not only be signed by the party to be charged, it must also identify the party seeking to enforce the alleged contract. Since we have determined that the two documents fail to indicate that a contract has been made, as specifically required by section 8.319, we need not determine whether the documents must also identify the party seeking enforcement.

## II. Promissory Estoppel

Southmark alternatively argues that if the documents it produced do not satisfy the requirements of section 8.319, nevertheless Life should be estopped from asserting a statute of frauds defense. Citing *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 938 (Tex. 1972), Southmark argues that the doctrine of promissory estoppel removes a contract from the statute of frauds if the plaintiff establishes that: (1) the defendant promised to sign an instrument complying with the statute of frauds; (2) the defendant should have realized his promise would cause injury to the plaintiff; (3) such injury occurred; and (4) injustice will result if the promise is not enforced. In the present case, Southmark contends that the last three elements are self-evident. With regard to the first element, Southmark points to the affidavit of Thomas Walker (Walker), a Southmark vice president, who stated that Life's representatives promised in an April 1985 Atlanta, Georgia meeting "that

an agreement had been reached and that they (Life's representatives) would execute final documents consummating that agreement." Southmark also points to the affidavit of Jerome Levy (Levy), another Southmark vice president, who stated that on July 19, 1985 he was told by a representative of Life "that the purpose of the meeting" scheduled for July 24, 1985 in New York "was to resolve the final points of discussion and put the contract in a form to be executed that week" and that

> "[d]uring the April–July, 1985 period, there were several conversations between Art Christoffersen [of Life] and myself pertaining to the fact that there was a firm agreement between the parties and that the only items necessary to close the transaction were execution of the documents and the requisite regulatory approvals."

These affidavits, according to Southmark, at least raise a fact issue regarding Life's promise to sign an instrument complying with section 8.319.[8] We disagree.

In further support of its promissory argument, Southmark cites *Cobb v. West Texas Microwave Co.*, 700 S.W.2d 615 (Tex. App.—Austin 1985, writ ref'd n.r.e.). In that case, the trial court entered a summary judgment in favor of the defendants on the ground that the oral lease that the plaintiff sought to enforce was barred under the statute of frauds. The appellate court reversed, stating that on the promissory estoppel issue the plaintiff had adduced some proof raising a fact issue that the defendants had promised to sign an instrument complying with the statute of frauds. In particular, the plaintiff had adduced: (1) his own affidavit in which he stated that the defendants had promised to reduce the oral agreement to a written lease; and (2) a letter from one of the

real transaction. However, where the writing does not indicate that any real contractual transaction between the parties has taken place, and at most indicates that such *may* take place subsequent thereto, the *writing* does not afford a sufficient basis for believing that the oral evidence of a contract "rest[s] on a real transaction." *See Martco*, 632 S.W.2d at 929. Moreover, any other conclusion would read the "has been made" language out of section 8.319.

8. As mentioned, the district court rejected this argument stating that under Texas law the party to be charged must have promised to sign the written agreement. According to the district court, "[t]he affidavits submitted by Plaintiff do not clearly state that Life ever promised to sign any particular agreement."

defendants to the plaintiff in which the defendant stated that "we will enter into a mutually agreeable lease arrangement, which you, in your most expedient manner, will execute as soon as possible." *Id.* at 616–17.

Given the facts here, however, we think the district court correctly rejected Southmark's promissory estoppel theory. In *"Moore" Burger*, the court held that an oral promise to sign a written agreement that complies with the statute of frauds is enforceable and sufficient to overcome a statute of frauds defense if: (1) the promisor should have reasonably expected that the promise would induce the promisee to take action that would lead to definite and substantial injury; (2) the promise did induce the promisee to take such action leading to injury; and (3) enforcement of the promise is the only means of avoiding injustice to the promisee. *"Moore" Burger*, 492 S.W.2d at 938. In *"Moore" Burger*, the determinative promise was a promise to sign a written agreement that had already been prepared and that did in fact comply with the statute of frauds. *See id.* at 938, 940.[9] Thus, in *Consolidated Petroleum Indus. v. Jacobs*, 648 S.W.2d 363 (Tex.App. —Eastland 1983, writ ref'd n.r.e.), which involved an oral agreement that was subject to the provisions of section 8.319, the court held that the doctrine of promissory estoppel does not apply where there is no proof of a promise to sign a written contract that *had been prepared* and that would satisfy the requirement of the statute of frauds. *Id.* at 367.

■ In the present case, it is clear that Life never promised to sign a written agreement that had already been prepared; indeed, the affidavits themselves indicate that at most the parties contemplated final documents that were to be prepared and approved sometime in the future. But in a transaction involving the sale of a controlling share of the stock of an ongoing business at a purchase price in the tens of millions of dollars and involving substantial seller financing with attendant security, there is certainly an expectation on both sides that documents will be prepared once the parties reach an agreement. We cannot say that where such an agreement is involved justice requires the enforcement of an oral promise to reduce the agreement to writing or to execute final documents at a later time, especially where, as here, it does not appear that the parties had even worked out the final details of the alleged transaction.[10] To hold otherwise would render the statute of frauds useless in cases where the parties acknowledge the fact that an agreement to consummate such a massive and complicated transaction must eventually be reduced to writing, the

9. In *Nagle v. Nagle*, 633 S.W.2d 796 (Tex.1982), the Texas Supreme Court made it clear that *"Moore" Burger* had thus limited the promissory estoppel exception to cases where the promise was "to sign a written agreement which itself complies with the Statute of Frauds." *Id.* at 800.

10. The contemplated transaction was a complex one. Drafts of a "letter of intent" prepared by Southmark indicate that it involved a purchase from Life (and affiliated corporations) of IB stock for some fifty-seven million dollars and of USLICO stock for some nine million dollars, with one-quarter of the price to be paid in cash at closing and the balance in accordance with a four-year note. The proposed letter of intent called for the transaction to be subject to various contingencies and for the parties "to negotiate, execute and deliver a binding Definitive Agreement," and also provided that in most respects the letter "is not intended to constitute a binding contract upon any party." In April 1983, Southmark tendered such a letter of intent signed by it, but Life never executed it or any other such letter. Subsequently, drafts of a proposed formal agreement were prepared by Southmark or its counsel. One such draft was circulated by Southmark's Atlanta, Georgia counsel with a letter dated July 20, 1985 stating in part that there have been "substantial changes since the previously circulated draft," that "the enclosed drafts have not been reviewed by Southmark and are subject to further modification," and that they "will be used as discussion drafts" for the scheduled July 24 meeting in New York. The draft agreement itself is sixteen single-spaced pages and its two exhibits, a form of note and a form of collateral pledge agreement, are respectively two and twelve single-spaced pages. The draft agreement is subject to various contingencies, and calls for closing in New York not earlier than October 10, 1985; it also provides that it will be governed by Georgia law. There is no evidence that the July 20, 1985 draft, or any other, or any letter of intent, was ever agreed to—orally or otherwise—by Life.

wording of which is yet to be agreed on. Instead, following the rule set forth in *Consolidated Petroleum*, we think that where the plaintiff alleges that the defendant agreed to sell a controlling share of an ongoing business in a complex multimillion dollar deferred payment transaction, the defendant should ordinarily not be promissorily estopped from asserting a section 8.319 statute of frauds defense unless there is proof that he at least expressly promised to sign documents that had already been prepared or whose wording had been agreed on and that satisfy the requirements of section 8.319.

Moreover, there is no evidence that Life should have reasonably expected that its alleged promise to execute final documents would induce Southmark to act in a way that would lead to its definite and substantial injury. According to Walker, Southmark chose not to pursue potentially profitable business opportunities that arose between April and August 1985 because of Life's promise to execute final documents consummating the IB stock purchase agreement. However, Walker's essentially conclusional affidavit reflects that Life made that promise in April 1985 when representatives from both sides met in Atlanta, Georgia to discuss the possibility of a stock sale. Levy's affidavit never actually states that a promise to execute documents was made, and the last discussion it refers to occurred on July 19, 1985. But at both times Life and Southmark knew that Life could sell the stock only if Olmsted decided not to exercise his option in the 1984 Memorandum of Understanding, and at both times it was not yet clear whether Olmsted would actually purchase the shares. Indeed, as of May 31, 1985, when Olmsted officially accepted Life's offer, it appeared that Olmsted would in fact purchase the shares. It was not until July 22, 1985 that either party was or could be assured that Olmsted would not purchase the securities after all.[11] Thus, until that time there existed the real possibility that Olmsted would purchase the IB shares and that Southmark would be unable to finalize its deal with Life. Both parties knew a transaction between Southmark and Life might never take place, and each knew that the other was aware of that. In this setting, to the extent that there is a showing of any oral promise by Life to subsequently reduce the agreement to a writing to be agreed on and executed, Life cannot have reasonably expected that the promise so shown would induce Southmark to action leading to its definite and substantial injury.

Neither *Cobb* nor any other case cited by Southmark compels the conclusion that Southmark's estoppel theory precluded summary judgment for Life. In *Cobb*, the defendant at least provided a written acknowledgement of the oral lease agreement as well as of the agreement to execute a document embodying it. Pursuant to the agreement and in reliance on the defendant's promises, the plaintiff spent $312,237 renovating the lease space. Because the renovations were part of the agreement, the defendant certainly should have expected that its promises would induce the plaintiff to undertake his contractual obligations by making the renovations. Under these circumstances, it seems clear

11. Both Levy and Walker stated in their affidavits that in June 1985 Southmark understood that Olmsted would not be able to consummate an agreement with Life. This information apparently came from Charles Roth, the securities broker who initially advised Southmark of the possibility of acquiring Life's IB shares. However, Levy indicated that at the end of June Olmsted was given an extension of time to locate the requisite funding for the proposed stock purchase.

Arthur Christoffersen, the executive vice president of Life, stated in his affidavit that on July 22, 1985 counsel for IB told Life's counsel that the problems with Olmsted were resolved and that Olmsted was assigning his contract to purchase the IB stock to USLICO. Christoffersen notified Southmark of this development the same day. Nothing in the affidavits of Southmark's officers indicates that Southmark was notified of Olmsted's status prior to that date. In fact, Southmark suggests in its brief on appeal that it was not officially informed of Olmsted's status until August 9, 1985, when the president of IB notified Southmark that Olmsted was not going to purchase the IB securities. In any event, nothing in the record indicates that either party knew prior to July 22, 1985 that Olmsted would definitely be unable to purchase the securities.

that an injustice would occur unless the defendant were estopped from asserting a statute of frauds defense.

In the present case, however, there was neither a written acknowledgement of the alleged oral sales agreement nor of any agreement to execute final documents embodying the agreement already made. Moreover, Southmark had not performed under the alleged agreement,[12] nor had it made actual expenditures or binding commitments with third parties in reliance on Life's promises. Instead, Southmark claims only that it lost potential profits from business opportunities it passed up, largely if not wholly while it was uncertain whether Olmsted would purchase the shares. These circumstances are thus markedly different from those presented in *Cobb.* Indeed, the factors creating the potential for injustice in *Cobb* and similar cases,[13] *viz.,* the promisee's partial performance and actual expenditures or binding commitments made in reliance upon a promise that could be expected to induce the promisee to take such action, are simply not present in the case at hand. Texas courts have made it clear that promissory estoppel should be invoked only when the

circumstances are so egregious as to render it inequitable for the court to apply the statute of frauds, *see Reynolds v. Stevens,* 659 F.2d 44, 45 (5th Cir.1981), but in this case we cannot say that such circumstances exist.

To allow promissory estoppel to defeat the statute of frauds in a case such as this would, as a practical matter, render the statute almost meaningless. We do not believe the Texas courts are prepared to go that far. Accordingly, we conclude that the district court properly rejected Southmark's promissory estoppel plea, and we therefore affirm the summary judgment in favor of Life.

### III. In Personam *Jurisdiction*

As previously mentioned, Southmark joined USLICO as a defendant in this action claiming that USLICO tortiously interfered with Southmark's alleged contract and business relations with Life. Under Texas law, there may be liability for tortious interference with the performance of a contract even if the contract is unenforceable under the applicable statute of frauds.[14] In this case, however, the district court did not reach the substance of South-

12. Although Texas courts have held that full or partial performance of an oral agreement by one party may preclude invocation of the statute of frauds by the other, there are cases in which the court refused to enforce the oral agreement even where the plaintiff had performed. *See, e.g., Mercer v. C.A. Roberts Co.,* 570 F.2d 1232, 1237 (5th Cir.1978).

13. Other cases in which the court found that the doctrine of promissory estoppel may be properly asserted are similarly distinguishable from the present case. In *Computer Sys. of Am., Inc. v. International Business Mach. Corp.,* 795 F.2d 1086 (1st Cir.1986) (applying Texas law), for example, there was evidence of an existing document that confirmed the parties' lease agreement and the general terms thereof, and there was evidence of a written promise to sign a more comprehensive and formal agreement at a later time. *See id.* at 1087, 1093–94. Moreover, in reliance on the defendant's promises, the plaintiff had already modified the leased equipment to meet the defendant's particular needs and had undertaken steps to facilitate the installation of the equipment at the defendant's facilities. *Id.* at 1088.

Likewise, in *Magcobar N. Am. v. Grasso Oilfield Serv., Inc.,* 736 S.W.2d 787 (Tex.App.—Corpus Christi 1987, dismissed as moot), another

case involving an alleged lease agreement, there was evidence that the party seeking to invoke the doctrine of promissory estoppel had sustained losses from moving onto and off of the leased premises and had suffered damages in the amount of $150,000 in reliance on the other party's promises. In addition, the promisor knew that the promisee had entered into a burdensome supply contract with a third party under the expectation that the promisor would follow through with its promises. This case and the *Computer* case mentioned above clearly present circumstances that are more egregious than those here.

14. *See Clements v. Withers,* 437 S.W.2d 818, 821 (Tex.1969). This assumes the contract is neither void nor illegal and that public policy does not oppose its performance. *See id. See also Hi-Line Elec. Co. v. DowCo Elec. Prod.,* 765 F.2d 1359, 1362 (5th Cir.1985) (the unenforceability of a contract on public policy grounds is a complete defense to a claim of tortious interference). While the alleged contract in this case is voidable under the statute of frauds, it is neither void nor illegal, nor does public policy oppose its performance.

mark's claims because it determined that it lacked personal jurisdiction over USLICO, which is a Virginia company.

On appeal, Southmark contends that the district court erred in dismissing the action against USLICO because the district court has both general and specific *in personam* jurisdiction over USLICO. "General jurisdiction" is personal jurisdiction based on a defendant's contacts with the forum that are unrelated to the controversy. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). To exercise general jurisdiction, the court must determine whether "the contacts are sufficiently systematic and continuous as to support a reasonable exercise of jurisdiction." *Stuart v. Spade,* 772 F.2d 1185, 1191 (5th Cir.1985) (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 1480–81, 79 L.Ed.2d 790 (1984)). "Specific jurisdiction," on the other hand, is personal jurisdiction based on contacts with the forum that are related to the particular controversy. *Helicopteros Nacionales,* 104 S.Ct. at 1872. Even a single purposeful contact may in a proper case be sufficient to meet the requirement of minimum contacts when the cause of action arises from the contact. *Micromedia v. Automated Broadcast Controls,* 799 F.2d 230, 234 (5th Cir.1984). But to exercise specific jurisdiction, the court must examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice. *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 777 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1892, 95 L.Ed.2d 499 (1987) (citing *Shaffer v. Heit-*

*ner,* 433 U.S. 186, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)).

Relying primarily on *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), Southmark contends that the district court had specific jurisdiction over USLICO because there is *prima facie* evidence that USLICO committed an intentional tort against Southmark in Texas with knowledge that Southmark is a Texas resident.[15] Southmark is incorporated in Georgia and has its principal place of business in Texas. Under the circumstances, however, we think Southmark's reliance on *Calder* and its progeny is misplaced.

■ In *Calder,* the Supreme Court held that when an alleged tort-feasor's intentional actions are expressly aimed at the forum state, and the tort-feasor knows that the brunt of the injury will be felt by a particular resident in the forum, the tort-feasor must reasonably anticipate being haled into court there to answer for its tortious actions. *Id.* 104 S.Ct. at 1487. This holds true even if the tort-feasor's conduct occurs in a state other than the forum state. *Id.* at 1488. But in the present case, there is no evidence that USLICO expressly aimed its allegedly tortious activities at Texas, nor is there evidence that USLICO knew the brunt of Southmark's injury would be felt there.

Indeed, the oral agreement with which USLICO allegedly interfered was apparently negotiated and made in Atlanta and/or New York, and there is no evidence that the agreement was made or to be performed in Texas or governed by Texas law.[16] Life, the other party to the purport-

---

**15.** In a diversity action, personal jurisdiction may be exercised over a nonresident defendant if: (1) the nonresident defendant is amenable to service of process under the law of the forum state; and (2) the exercise of jurisdiction under state law comports with the due process clause of the Fourteenth Amendment. *Stuart v. Spademan,* 772 F.2d 1185, 1189 (5th Cir.1985). The Texas long-arm statute extends personal jurisdiction to nonresidents when the action arises from the nonresident's business in the state, and doing business includes committing a tort in whole or in part in Texas. Tex.Civ.Prac. & Rem.Code Ann. §§ 17.042–.043. Because the Texas long-arm statute has been interpreted to

extend to the limits of due process, *see Helicopteros Nacionales de Colombia,* 638 S.W.2d 870, 872 (Tex.1982), *rev'd on other grounds,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (interpreting Tex.Rev.Civ.Stat.Ann. art. 2031b, which has since been recodified at Tex.Civ.Prac. & Rem.Code Ann. §§ 17.041–.045), the principal question here is whether the assertion of jurisdiction over USLICO by the district court is constitutionally permissible.

**16.** Southmark also relies on *Union Carbide Corp. v. UGI Corp.,* 731 F.2d 1186 (5th Cir.1984), in support of its specific jurisdiction argument. In that case, however, the contract with which

ed agreement, is not a resident of Texas, nor is Olmsted. The company whose stock Southmark wished to purchase and that USLICO did purchase was not a Texas corporation and it did not, so far as the record shows, do any business in Texas. Nor is there evidence that the stock was located or purchased in Texas. Southmark itself is incorporated in Georgia, and USLICO is a Virginia company domiciled in Washington, D.C.

In short, nothing in the record indicates that USLICO expressly aimed its allegedly tortious activities at Texas, or that Texas is even the focal point of USLICO's tortious conduct.[17] Moreover, it is not even clear that Southmark would feel the brunt of its injury in Texas. While it may be true that USLICO agreed to buy the stock knowing that Southmark has its principal place of business in Texas, and that Southmark is therefore a Texas resident for jurisdictional purposes, we do not think this fact standing alone would cause USLICO to anticipate being haled into a Texas court to answer for its conduct. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (noting that the mere foreseeability of causing injury in another state is not a "sufficient benchmark" for exercising personal jurisdiction). Indeed, under the circumstances, the fact that Southmark has its principal place of business in Texas is, as the district court put it, a mere fortuity. Cf. Patterson v. Dietze, Inc., 764 F.2d 1145, 1147 (5th Cir.1985) (where defendant's contact with the forum rests solely on "the mere fortuity that the plaintiff happens to be a resident of the forum," due process requirements are not satisfied). We therefore reject Southmark's specific jurisdiction argument.

Having concluded that specific jurisdiction is lacking, we now consider whether Southmark has established that general jurisdiction exists. To do so we must examine the nature of USLICO's contacts with Texas to determine whether they constitute the kind of continuous and systematic contacts required to satisfy due process.

■ USLICO asserts, and Southmark does not dispute, that USLICO has no offices or real property in Texas; it has no address, bank account, or telephone listing in Texas; it does not recruit or maintain employees in Texas; it has never performed services or paid taxes in Texas; and it does not regularly advertise or send personnel to Texas on USLICO business. Nonetheless, Southmark contends that USLICO's subsidiaries that do business in Texas are alter egos or agents of USLICO and that the general jurisdiction that Texas courts have over the subsidiaries may be imputed to USLICO. We do not agree.

The district court found, with adequate support from the record, that USLICO's subsidiaries: (1) keep separate books and bank accounts; (2) file a consolidated federal income tax return separate from the return filed by USLICO; (3) are managed by separate boards of directors that have overlapping, but not identical, memberships with USLICO; and (4) are centrally managed by the officers of USLICO's largest subsidiary and not by officers of USLICO. The district court also correctly determined that Southmark has not shown any particular instances where USLICO interfered with or directed the day-to-day business of its subsidiaries. The district court therefore concluded that jurisdiction over the subsidiaries could not be imputed to USLICO. This conclusion comports with existing law. In this Circuit, it is well-settled that where, as here, a wholly owned subsidiary is operated as a distinct corporation, its contacts with the forum cannot be

the defendant tortiously interfered was a contract that was being performed in the forum. Moreover, the defendant interfered with that contract by entering into another contract, also to be performed in the forum, with one of the parties to the original agreement. Under these circumstances, which are not present in the case at hand, it is far more likely that the defendant will anticipate being haled into court in the forum to answer for its tortious activities.

17. Southmark has argued that personal jurisdiction over USLICO exists because USLICO availed itself of the protection of Texas laws by selling securities in Texas to finance the purchase of the IB shares. However, the securities in question were actually offered by an underwriter after Southmark had already filed this suit.

774

imputed to the parent.[18] Since USLICO has no other systematic and continuous contacts with Texas, we conclude that general jurisdiction does not exist.

■ We therefore hold that the district court properly granted USLICO's motion for dismissal for lack of *in personam* jurisdiction. In the final judgment, however, the district court entered a take-nothing judgment in favor of both Life and USLICO. Because the district court lacked jurisdiction over USLICO and thus did not reach the merits of Southmark's tortious interference claims, it should not have entered a judgment on the merits in favor of USLICO. To correct this error, we hereby modify the district court's final judgment so as to dismiss the suit against USLICO for lack of jurisdiction.

## Conclusion

We determine that the two written documents produced by Southmark fail to satisfy the requirements of the statute of frauds. Furthermore, we agree with the district court's conclusion that, under the circumstances presented in this case, no factual showing is made sufficient to justify a finding that Life is estopped from asserting a statute of frauds defense. Since the alleged contract is unenforceable under the statute of frauds, we agree that Life is entitled to judgment as a matter of law. We therefore affirm the judgment in favor of Life. Because we also agree that the district court lacked *in personam* jurisdiction over USLICO, we hereby modify the judgment for USLICO so as to dismiss the suit against it on jurisdictional grounds.

MODIFIED and AFFIRMED.

18. *See Bearry v. Aircraft Corp.*, 818 F.2d 370, 372–73 (5th Cir.1987). Relying solely on *Bellomo v. Pennsylvania Life Co.*, 488 F.Supp. 744 (S.D.N.Y.1980), Southmark argues that while USLICO's subsidiaries may not be its alter egos, they are its agents in Texas. Drawing a distinction between "agents" and "alter egos" under New York law, the *Bellomo* court held that where "subsidiaries are created by the parent, for tax or corporate finance purposes, to carry on business on its behalf, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries." *Id.* at 746.

However, the evidence does not establish actual agency and no court in this Circuit has drawn an analytical distinction between constructive agents of the *Bellomo* variety and alter egos for jurisdictional purposes (indeed, Southmark can point to no other case drawing such a distinction). We see no reason to make that distinction today. In this Circuit, it is established that so long as a parent and a subsidiary maintain separate and distinct corporate entitites, the presence of one in a forum state may not be attributed to the other. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983). Indeed, our cases "demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes." *Id.* Since it seems clear that USLICO and its subsidiaries operate as separate and distinct entities, and since Southmark has not even established a *prima facie* showing of actual agency under Texas law, we conclude that USLICO and its subsidiaries should not be fused for jurisdictional purposes under a *Bellomo* agency theory or an alter ego theory. The record here indicates that USLICO's business is investments, not selling insurance, which is the business of its subsidiaries, and that USLICO's business was largely of the kind its subsidiaries could not conduct. Southmark has not established the contrary. Thus, even the *Bellomo* theory would not support jurisdiction here. *See Bellomo*, 488 F.Supp. at 746; *McPheron v. Penn Central Transportation Co.*, 390 F.Supp. 943 (D.Conn.1975).