Opinion issued April 16, 2009







 






In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00065-CV






HARTFORD FIRE INSURANCE COMPANY, Appellant


V.


C. SPRINGS 300, LTD., Appellee






On Appeal from the 270th District Court

Harris County, Texas

Trial Court Cause No. 2003-65663






O P I N I O N

 On this date, the court considered appellee's motion for rehearing and motion
for en banc reconsideration. We deny the motion for rehearing, but withdraw our
opinion and judgment of May 29, 2008 and issue this opinion in their stead. As we
have issued a new opinion, we dismiss appellee's motion for en banc reconsideration
as moot. See Brookshire Bros. v. Smith, 176 S.W.3d 30, 40 n. 2 (Tex.
App.--Houston [1st Dist.] 2004, pet. denied) (supp. op. on reh'g).

 The issue in this case is whether a three-sentence letter from a company in the
business of issuing performance and payment bonds on construction projects creates
an obligation on the part of the company to issue $17 million in bonds in connection
with a construction project, or whether the letter was a "bondability letter" indicating
to the owner of the construction project that its chosen builder had the necessary
relationship with the company to obtain such bonds. We also consider whether the
owner of the construction project can recover for fraud based on the same letter. We
reverse and render.

BACKGROUND

The Vineyards construction project

 Appellee, C. Springs 300, Ltd. ["C. Springs"] is a limited partnership that was
formed to construct, own, and operate an apartment complex in Colorado Springs,
Colorado called "The Vineyards." C. Springs planned to finance The Vineyards as
a "HUD transaction," meaning that its mortgage would be insured under a U.S.
Department of Housing and Urban Development program.

 On July 5, 2000, C. Springs selected Williams Company, a Houston contractor,
to build The Vineyards. Having selected a contractor, C. Springs applied to HUD for
HUD-guaranteed financing. On August 1, 2000, HUD issued a deficiency letter to
C. Springs indicating that the application was incomplete. Among other things, HUD
requested "an assurance of completion" from the contractor, Williams, by August 11,
2000.

 C. Springs contacted Williams about obtaining the required information, and
Williams, in turn, contacted FG Insurance Services ["FGI"], a Houston company that
wrote surety bonds for several major surety companies, including appellant, Hartford 
Fire Insurance Company ["Hartford"]. Williams and FGI had a pre-existing business
relationship.

 On August 8, 2000, a Williams employee, Sherry Jett, contacted Kimberly
Smith, an administrative assistant to Richard Heidbrink, an agent for FGI, and
explained that Williams needed FGI to send a letter to C. Springs to show that
Williams was a bondable company. After making some changes to a letter that
Williams had used before, Smith received permission from Heidbrink to sign the
letter as Hartford's attorney-in-fact.

The August 8, 2000 letter

 The August 8, 2000 letter referenced "Vineyards at Colorado Springs
Apartments" and provided in its entirety:

 Williams Industries, Inc. is bonded through Hartford Fire Insurance
Company which is A+ rated on AM Best. They have a bonding line of
credit of $25,000,000 single and $100,000,000 aggregate. Upon receipt
of an acceptable contract, Hartford Fire Insurance Company stands
ready to issue 100% performance and payment bonds in the full amount
of the contract.


 After obtaining the August 8 letter, C. Springs and Williams continued toward
finalizing a HUD construction contract, which was set to close in mid-December.

Williams's financial position declines.

 Because of problems on other construction projects, Williams's financial
position began to decline. Williams lost approximately 1 million dollars between
August and October 2000. On October 19, 2000, Hartford instructed FGI that it was
"suspending all bond support of Williams Industries until further notice." In
November 2000, Hartford decided that it would issue no further security bonds to
Williams.

 On November 7, 2000, a little over a month before the scheduled HUD closing,
Williams informed C. Springs of problems securing performance and payment bonds
for the project. Williams continued to assure C. Springs that it could work out its
problems with obtaining the bonds, and the two parties continued to work toward the
December HUD closing. However, on December 4, 2000, Williams informed C.
Springs that it was not going to be able to secure the bonds by the end of 2000. As
a result, C. Springs and Williams never signed a construction contract. On December
8, 2000, Smith, of FGI, send C. Springs a letter stating that "an acceptable contract
was not received" and "[i]n the absence of a contract and application, Hartford Fire
Insurance Company did not issue any bond in connection with the referenced
project."

C. Springs hires another contractor and finishes the project

 In late November 2000, after becoming aware of Williams's problem obtaining
bonds, C. Springs began negotiating with another contractor, Global Construction
["Global"], to build the project. After Williams informed C. Springs on December
4 that it could not obtain the necessary bonds, C. Springs moved forward with the
project using Global as contractor.

 Global's insurance broker also sent a letter to C. Springs regarding its ability
to obtain the bonds. The letter Global obtained provided, "Naturally, Liberty Mutual
Insurance Company would expect that the execution of any final bonds would be
subject to a review of the final contract terms and conditions."

 In February 2001, C. Springs closed on the HUD contract with Global as its
contractor. The contract price was $18.9 million dollars--$1.9 million dollars more
than the $17 million dollars C. Springs had planned to pay Williams.

C. Springs files suit

 C. Springs subsequently brought the underlying suit alleging breach of contract
against Hartford and fraud against Hartford, FGI, Guaranty, (1) Smith, and Williams. 
Essentially, C. Springs's petition alleged (1) that the August 8 letter was a contract,
which Hartford breached by not later issuing the bonds; and (2) that Hartford, through
its agents, had fraudulently misrepresented to C. Springs that it would issue the
bonds.

The trial and jury verdict

 C. Springs settled with Smith, nonsuited Williams, and proceeded to trial
against the remaining defendants. Two liability questions were submitted to the jury
as follows:

Question 1


 Did the August 8, 2000 letter from Kimberly Smith to David Steidley
constitute an agreement under which Hartford agreed that it would issue
100% performance and payment bonds for the full amount of the
contract between Williams and C. Springs, if any, for the construction
of the Vineyards project in Colorado Springs?


 It is your duty to interpret the following language in the
August 8, 2000 letter: "upon receipt of an acceptable
contract." You must decide its meaning by determining the
intent of the parties at the time the letter was written. 
Consider all of the facts and circumstances surrounding the
making of the letter, the interpretation of the letter by the
parties, and the conduct of the parties


 * * * *

 * * * *

 Answer Yes or No:

 Yes Yes

 No ___




Question 5



 Did one or more of the defendants commit fraud against C. Springs?


 Fraud occurs when--


 a. a party makes a material misrepresentation

 b. the misrepresentation is made with knowledge of its falsity or
made recklessly without any knowledge of the truth and as a
positive assertion.

 c. the misrepresentation is made with the intention that it should be
acted on by the other party, and

 d. the other party relies on the misrepresentation and thereby suffers
injury

 

 "Misrepresentation" means:


 A false statement of fact or

 

 A promise of future performance made with an intent, at the time the promise was made, not to perform as promised.


 A party's denial that he ever made a promise is a factor showing no intent
to perform when he made the promise.


 * * * *

 Answer Yes or No for each of the following:


 Hartford Yes

 Guaranty No

 FGI No

 Kimberly Smith No


The jury awarded $4,278,117 for the difference between what C. Springs paid and
would pay under the contract with Global and what it would have paid under a
contract with Williams, including "interest expense" due to a difference in mortgage
rates on debt incurred in connection with the project. The jury also awarded $362,345
in lost rentals from the Vineyards and $96, 507 for out-of-pocket expenses incurred
by C. Springs. The total damages awarded was $4,736,969. The same measure of
damages was awarded for both the contract claim and the fraud claim.

STATUTE OF FRAUDS


 Hartford contends that the trial court erred in denying its motion for instructed
verdict and submitting the contract issue to the jury because the August 8, 2000 letter
was not, as a matter of law, an enforceable contract. Specifically, Hartford argues that
the lack of an essential term causes the contract to fail under the statute of frauds.

Standard of review 

 A denial of a motion for directed verdict may be reversed when the evidence
conclusively proves a fact that establishes a party's right to judgment as a matter of
law, and there is no evidence to the contrary. See McCarley v. Hopkins, 687 S.W.2d
510, 512 (Tex. App.--Houston [1st Dist.] 1985, no writ). In reviewing the denial of
an instructed verdict, we consider all the evidence in the light most favorable to the
nonmovant and disregard all evidence to the contrary. Harris County v. Demny, 886
S.W.2d 330, 333 (Tex. App.--Houston [1st Dist.] 1994, writ denied). Every
reasonable inference is resolved in favor of the nonmovant. Id. If there is any
conflicting evidence of probative value on any theory of recovery, the issue must go
to the jury. Cliffs Drilling Co. v. Burrows, 930 S.W.2d 709, 712 (Tex. App.--Houston
[1st Dist.] 1996, no writ).


Applicable law

 A contract that creates a suretyship must also comply with the statute of frauds. 
See Tex. Bus. & Com. Code Ann. § 26.01(a), (b)(2) (Vernon 2002 & Supp. 2008). 
To satisfy the statute of frauds, there must be a written memorandum which is
complete with itself in every material detail and that contains all of the essential
elements of the agreement, so that the contract can be ascertained from the writing
without resorting to oral testimony. Cohen v. McCutchin, 565 S.W.2d 230, 232 (Tex.
1978); Frost Nat'l Bank v. Burge, 29 S.W.3d 580, 594 (Tex. App.--Houston [14th
Dist.] 2000, no pet.).

Does the statute of frauds apply to an agreement to enter a surety contract?

 C. Springs, however, argues that the statute of frauds does not apply to the
August 8, 2000 letter "[b]ecause the letter binds Hartford only to issue the bonds, not
actually to perform in accordance with their terms[.]" Essentially, C. Springs argues
that a promise to enter a surety relationship is different from the surety relationship
itself. Thus, C. Springs argues that the promise to issue the bonds need not contain
all the essential terms of the bonds themselves. We disagree.

 "A promise to sign a written contract as surety for the performance of a duty
owed to the promisee . . . is within the Statute of Frauds." Restatement (Second)
of Contracts § 117 (1981). Similarly, an agreement to make a future contract is
enforceable only if it is specific as to all essential terms. Fort Worth Indep. Sch. Dist.
v. City of Fort Worth, 22 S.W.3d 831, 846 (Tex. 2000).. A contract to enter a contract
covered by the statute of frauds must also meet the statute of frauds. See Bayor Univ.
v. Sonnichsen, 221 S.W.3d 632, 635 (Tex. 2007) (holding that statute of frauds bars
breach of contract claim based on oral promise to enter contract not performable in
one year). Thus, the argument that this is a contract to issue the bonds rather than the
bond contract itself is irrelevant. The same requirements apply to both.

Does the letter adequately describe the essential terms of the alleged agreement?

 We turn to whether the letter in this case contains sufficient "essential terms"
to comply with the statute of frauds, or whether it fails for indefiniteness. The letter
in this case provides that, "[u]pon receipt of an acceptable contract, Hartford Fire
Insurance stands ready to issue 100% performance and payment bonds in the full
amount of the contract." The letter, however, provides little more information. 

 To comply with the statute of frauds, a memorandum of a guaranty or suretyship
must contain (1) the parties involved, (2) a manifestation of intent to guarantee the
obligation, and (3) a description of the obligation being guaranteed. Park Creek
Assocs., Ltd. v. Walker, 754 S.W.2d 426, 429 (Tex. App.--Dallas 1988, writ denied). 
Hartford argues that the second element--a manifestation of intent to guarantee
Williams's obligation--is missing from the August 8, 2000 letter. Specifically,
Hartford argues that the letter shows no present intent to be bound, but instead
contemplates further actions by the parties. We agree.

 Under Texas law, a writing that contemplates a contract or promise to be made
in the future does not satisfy the requirements of the statute of frauds. See Martco,
Inc. v. Doran Chevrolet, Inc., 632 S.W.2d 927, 928-29 (Tex. App.--Dallas 1982, no
writ); Southmark Corp. v. Life Investors, Inc., 851 F.2d 763, 767 (5th Cir. 1988);
Document Imaging, Inc. v. Ipro, Inc., 952 F. Supp. 462, 468 (S.D. Tex. 1996). 
Writings that contain "futuristic" language are insufficient to confirm that a contract
or promise is already in existence. Martco, 632 S.W.2d at 928; Southmark 851 F.2d
at 767.

 The writing in this case provides that, "upon receipt of an acceptable contract,
Hartford "stands ready" to issue the bonds. This "futuristic" language clearly
contemplates a future contract, and cannot be reasonably construed as reflecting a
present intent by Hartford to guarantee Williams's performance. Indeed, the language
clearly contemplates that Williams or C. Springs will first provide Hartford with an
"acceptable contract." (2) Second, Hartford's statement that it "stands ready" also
indicates that Hartford had no present intent to be bound at the time the August 20
letter was signed. See Maderas Tropicales v. Southern Crate & Veneer Co., 588 F.2d
971, 974 (5th Cir. 1979) (holding Southern Crate's letter that it "stands willing and
able to purchase all the cleats that (Willimgham) can manufacture" insufficient to
comply with statute of frauds because it shows offer to purchase in the future, not
present intent to contract).

 Because an essential term of the August 8, 2000 letter--particularly, Hartford's
intent to guarantee Williams's obligations--cannot be ascertained from the writing,
the letter is too indefinite, as a matter of law, to form a binding promise that complies
with the statute of frauds. At best, the August 8, 2000 letter shows an agreement to
agree at some future date. As such, the trial court erred in submitting the breach of
contract issue to the jury.

FRAUD

 C. Springs's fraud claim rests on two alleged misrepresentations in the August
8, 2000 letter. We address each respectively.

Fraudulent inducement

 First, C. Springs claims that Hartford misrepresented its willingness to issue the
bonds, which, in turn, induced C. Springs into accepting the offer by partial
performance. As such, C. Springs's first fraud claim is one of fraudulent inducement.
We have already held that the August 8, 2000 letter did not create an enforceable
contract. Absent an enforceable contract, C. Springs cannot claim that it was
fraudulently induced to enter such contract. Haase v. Glazner, 62 S.W.3d 795, 798
(Tex. 2001).

Common-law fraud

 Second, C. Springs argues that the August 8, 2000 letter contained a
misrepresentation of fact--the amount of Williams's bondability--that C. Springs
relied on in moving forward with Williams as contractor. Specifically, the letter stated
that Williams had a "bonding line of credit of $25,000,000 single and $100,000,000
aggregate." However, the evidence shows, and Hartford concedes, that this is a
"mistake," and that Williams's credit had "never exceeded $10 million for a single job
and $85 million aggregate." We address whether this fraud claim (1) was pleaded, (2)
is supported by sufficient evidence, and (3) gives rise to the damages awarded on it.

 Sufficiency of pleading on the issue

 A trial court cannot enter judgment on a theory of recovery not sufficiently set
forth in the pleadings or otherwise tried by consent. Miller v. Towne Servs., Inc., 665
S.W.2d 143, 147 (Tex. App.--Houston [1st Dist.] 1983, no writ); see also Tex. R.
Civ. P. 301 (providing that the "judgment of the court shall conform to the
pleadings"). There are, however, exceptions to rule 301. Unpleaded claims or
defenses that are tried by express or implied consent of the parties are treated as if they
had been raised by the pleadings. See Roark v. Stallworth Oil & Gas, Inc., 813 S.W.2d
492, 495 (Tex. 1991). The party who allows an issue to be tried by consent and who
fails to raise the lack of a pleading before submission of the case cannot later raise the
pleading deficiency for the first time on appeal. Id. Moreover, "[w]hen issues not
raised by the pleadings are tried by express or implied consent of the parties, they shall
be treated in all respects as if they had been raised in the pleadings." Tex. R. Civ. P.
67. To determine whether an issue was tried by consent, we examine the record not
for evidence of the issue, but rather for evidence of trial of the issue. Case Corp. v.
Hi-Class Bus. Sys. of Am., Inc., 184 S.W.3d 760, 771 (Tex. App.--Dallas 2005, pet.
denied). A party's unpleaded issue may be deemed tried by consent when evidence
on the issue is developed under circumstances indicating that both parties understood
the issue was in the case, and the other party failed to make an appropriate complaint. 
Id.

 At the charge conference, Hartford objected to submitting the definition of
misrepresentation as a "false statement of fact" because "there are no pleadings to
support plaintiff's claim that the reference to Williams's bonding line of credit in the
August 8th letter was fraudulent, and the issue has not been tried by consent." The
trial court overruled Hartford's objection and submitted the issue to the jury.

 The record shows that the issue of Williams's bonding line of credit was raised
several times during the trial and supports the trial court's conclusion that the issue
was tried by consent.

 Legal and factual sufficiency of the evidence

 Next we turn to whether the evidence is legally and factually sufficient to
support the jury's finding that Hartford committed fraud based on its statement in the
August 8, 2000 letter that Williams had a "bonding line of credit of $25,000,000 single
and $100,000,000 aggregate." 

 When an appellant attacks the legal sufficiency of an adverse finding on an
issue on which it did not have the burden of proof, it must demonstrate that no
evidence supports the finding. Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). 
In deciding whether the evidence in support of the finding amounts to "no evidence,"
the reviewing court considers only the evidence and inferences tending to support the
jury's finding, views that evidence in the light most favorable to the finding, and
disregards all contrary evidence and inferences. Merrell Dow Pharm., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997); Havner v. E-Z Mart Stores, Inc., 825 S.W.2d 456,
458 (Tex. 1992); see City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005)
(holding that whether reviewing court starts with all or only part of record, it "must
consider evidence in the light most favorable to the verdict, and indulge every
reasonable inference that would support it," but "if the evidence allows of only one
inference, neither jurors nor the reviewing court may disregard it"). Thus, "[a]
no-evidence point will be sustained when (a) there is a complete absence of evidence
of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight
to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a
vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the
opposite of the vital fact." Merrell Dow Pharm., Inc., 953 S.W.2d at 711. "More than
a scintilla" of evidence exists to support a jury finding when the evidence supporting
the finding, taken as a whole, would enable reasonable and fair-minded people to draw
different conclusions. Id.

 In reviewing the factual sufficiency of the evidence to support a jury finding,
the court conducts a neutral review of all the evidence and sets aside the verdict only
"if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust." Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); see also Minucci v.
Sogevalor, S.A., 14 S.W.3d 790, 794 (Tex. App.--Houston [1st Dist.] 2000, no pet.).

 To prevail on a fraud claim, a plaintiff must prove that (1) the defendant made
a material representation that was false; (2) the defendant knew the representation was
false or made it recklessly as a positive assertion without any knowledge of its truth;
(3) the defendant intended to induce the plaintiff to act upon the representation; and
(4) the plaintiff actually and justifiably relied on the representation, which caused
injury. Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex.
2001). Thus, justifiable reliance and causation are necessary elements of fraud. Id.

 a. Justifiable Reliance

 Hartford admits that the August 8, 2000 letter contained a false statement of fact
about Williams's bonding line of credit, but argues that there is no evidence, or
insufficient evidence, to show that C. Springs justifiably relied on the statement. 
Specifically, Hartford argues that "C. Springs simply could not have relied on the
August 8 letter as an unconditional, unbreakable commitment to issue bonds" because
"[n]o one could reasonably believe that such a letter binds a surety to stand ready in
perpetuity to issue bonds whenever they are called for, on whatever contract price,
under whatever conditions exist at the time." We agree.

 Even if the August 8, 2000 letter had not contained a misrepresentation about
Williams's bonding line of credit, C. Springs could not have relied on the letter
without a representation that Williams would remain bondable. Put another way, the
letter does not promise that Williams's credit limit, in whatever amount, will continue
past the date of the letter. Absent a promise to lend against the line of credit--a
promise that we have already held Hartford did not make--the amount of Williams's
line of credit is irrelevant. Even when a bonding line exists and credit remains on it,
a surety is not bound to issue bonds absent an agreement to do so. William
Schwartzkopf, Practical Guide to Construction Contract Surety Claims
§ 2.04(H) (2007). Because the August 8, 2000 letter does not represent that
Williams's line of credit, in either the true or misrepresented amount, would continue
to exist into the indefinite future, C. Springs cannot claim to have justifiably relied on
any part of the letter in choosing to do business with Williams.

 b. Causation

 To establish the element of causation, a plaintiff must show that the defendant's
acts or omissions were a cause-in-fact of foreseeable losses. Marathon Corp. v.
Pitzner, 106 S.W.3d 724, 727 (Tex. 2003). A defendant's acts or omissions are a
cause-in-fact if the plaintiff can show, beyond mere conjecture, guess, or speculation,
that an act or omission was a substantial factor in bringing about an injury which
would not otherwise have occurred. Id. In this case, C. Springs's damages were not
caused by the misrepresentation regarding the amount of Williams' bonding line of
credit. Instead, C. Springs's damages were caused by the fact that Williams became
unbondable in any amount because of its deteriorating financial condition. The
misrepresentation in the August 8 letter was not a "substantial factor" in bringing
about C. Springs's injury because, regardless of the amount of the credit line stated in
the letter, Williams became unbondable. As such, the misrepresentation in the August
8 letter was not a cause-in-fact of C. Springs's damages.

 Because there is legally insufficient evidence to show that C. Springs justifiably
relied on the August 8, 200 letter, and that such justifiable reliance caused damage to
C. Springs, the jury's fraud findings do not support the damages awarded.






CONCLUSION

 We reverse the judgment of the trial court and render judgment that C. Springs
take nothing by way of its claims against Hartford.




 Sherry Radack

 Chief Justice


Panel consists of Chief Justice Radack and Justices Alcala and Bland.


1. ' 
 "' 
 "
2. " " 
 ' 
 
 
 
 
 " " 
 '