**MUNTERS CORPORATION, Appellant,**

v.

**SWISSCO–YOUNG INDUSTRIES, INC., Appellee.**

No. 01–00–00752–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 29, 2002.

Publication Ordered Jan. 17, 2003.

Clinard J. Hanby, The Woodlands, for Appellant.

David M. Gunn, Hogan Dubose & Townsend, L.L.P., Paul F. Waldner, III, Vickery & Waldner, L.L.P., Joseph A. McDermott, III, Houston, for Appellee.

Panel consists of Justices MIRABAL, HEDGES, and JENNINGS.

## OPINION ON REHEARING

ADELE HEDGES, Justice.

We deny Munters Corporation's motion for rehearing. We withdraw our previous opinion and judgment dated April 11, 2002, and issue this opinion in its stead.

This appeal arises from a suit based on deceptive trade practices. Appellant appeals the trial court's judgment in favor of appellee. We affirm.

### Background

In early 1990, appellee Swissco–Young Industries, Inc. (Swissco) contracted with Harbor Cogeneration (Harbor) to design and install a system that would increase the electric output from Harbor's cogeneration turbine. Part of this design incorporated two components, Plasdek and mist eliminators, that were supplied by appellant Munters Corporation (Munters).

The contract between Swissco and Harbor required that certain performance requirements be met before Swissco was entitled to payment. These requirements included: (1) the cooling achieved by the system had to meet or exceed a scale of temperature drops that varied with the outside temperature and humidity; (2) the pressure drop caused by the Plasdek could not exceed .98 inches of water; (3) the mist eliminators were required to eliminate 99% of particles larger than 30 microns; and (4) the pressure drop caused by the mist eliminators could not exceed .27 inches of water.

On March 11, 1991, Harry Locher, the founder of Swissco, sent a fax to Ben Flynn, a Munters engineer. The fax

asked for assurances that there would be no problems with pressure drops and turbulence. On March 12, 1991, Flynn sent a reply fax containing a mist collector proposal and providing data on how the product would perform.

Swissco purchased the products and installed the system. The mist eliminators did not perform as expected during testing. For example, the mist eliminators' pressure drop was 992% higher than expected, and water spray was visible. The test also noted that "[a]ir velocities ranged from 1000–6000 plus feet per minute around [mist eliminator]. Since [mist eliminators] do not operate at these high air velocities, this represents a significant design problem." The Plasdek pressure drop was 57% higher than expected, which was also a failure. Because the system did not meet the performance requirements, Harbor refused to pay Swissco. When Swissco contacted Munters to determine why the mist eliminators did not work, Munters did not provide any assistance. Subsequently, Swissco declared bankruptcy.

After a bench trial, the trial court ruled that Munters had violated the Deceptive Trade Practices Act (DTPA) by misrepresenting the quality of the mist eliminators. Judgment was rendered awarding Swissco $974,866.02 in damages, plus prejudgment interest, statutory additional damages, and attorney's fees.

On appeal, Munters argues that the evidence was legally and factually insufficient that: (1) it made a misrepresentation under the DTPA; (2) its violation of the DTPA was a producing cause of Swissco's failure; and (3) Swissco suffered lost profits of $974,886.02.

### Standard of Review

Findings of fact entered in a case tried to the bench are of the same force and dignity as a jury's verdict upon special questions. *Guerra v. Garza,* 865 S.W.2d 573, 575 (Tex.App.-Corpus Christi 1993, writ dism'd w.o.j.) (*citing City of Clute v. City of Lake Jackson,* 559 S.W.2d 391, 395 (Tex.Civ.App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.)). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards as are applied in reviewing the legal and factual sufficiency of the evidence supporting a jury's answer to a special question. *Guerra,* 865 S.W.2d at 575.

When reviewing a legal insufficiency point of error, we consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding and disregard any evidence and inferences to the contrary. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988). Under such a point, we are limited to reviewing only the evidence that tends to support the finding. *Id.* If there is more than a scintilla of evidence that supports the finding, we must overrule the point, and uphold the finding. *Id.*

When reviewing a factual insufficiency point, we examine all of the evidence, both the evidence that supports the finding and the evidence that controverts the finding. *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986); *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex.App.-Houston [1st Dist.] 1988, no writ). We can set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). In a bench trial, the trial court, as fact-finder, is the sole judge of the credibility of the witnesses. *Southwestern Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 493 (Tex.App.-

Houston [1st Dist.] 1992, writ denied). The judge may take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *Id.*

## DTPA

In its first issue, Munters argues that the evidence was legally and factually insufficient to show that Munters made a misrepresentation of material fact. Specifically, it challenges the legal and factual sufficiency of the evidence to support the trial court's conclusion of law 1 and findings of fact 10 and 11.

In its conclusion of law, the trial held:

(1) Munters violated the DTPA by representing that the demisters had benefits they did not have.

In its findings of fact, the trial court found:

(10) On March 12, 1991, Munters' engineer Ben Flynn faxed a response to Locher, assuring him that the matter had been looked in to by Munters' Engineering Department and that the mist eliminators, as fabricated by Munters, would be sufficient for the evaporative cooling system.

(11) Munters' literature assured Swissco that Munters could provide accurate data about how the mist eliminators would perform in the Harbor CoGen job.

### a. Misrepresentation

The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com.Code § 17.46(a) (Vernon Supp.2002). Section 17.46(b) provides a laundry list of specifically prohibited acts. Sections 17.46(b)(5) prohibits "false, misleading, or deceptive acts or practices includ[ing] ... representing that goods and services have characteristics, uses, [or] benefits ... which they do not have." *Id.* § 17.46(b)(5).

■ Actionable representations may be oral or written. *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 838 (Tex.App.-Amarillo 1993, writ denied). A party is not required to prove intent to make a misrepresentation under section 17.46(b)(5); making the false representation is itself actionable. *Smith v. Baldwin*, 611 S.W.2d 611, 616–17 (Tex.1980).

The evidence shows that Swissco contracted with Harbor to make its turbine more efficient during the summer. To meet this end, Swissco proposed to cool the air before it entered the turbine by utilizing a two-step system: step one put the water in; step two took the water out.

Because of engineering complexities, Swissco looked to Munters for the latter's engineering expertise. Munters supplied Plasdek, which puts the water in. As the air blows through to the turbine, the air is cooled by falling water. However, as air speed increases, some water is caught in the airstream, resulting in damage to the turbine. To solve this problem, Munters supplied a mist eliminator, designed to catch water droplets before they reach the turbine.

In a fax letter sent on March 11, 1991, Locher asked whether the system would overcome problems with turbulence or pressure drop in order to meet Harbor's performance requirements. Locher testified that he was "trying to see if Munters' product would work in this arrangement, and if so, what results we could expect from Munters, from the system, because [he] didn't have the expertise." Flynn's faxed response stated that: (1) a Munters T–130 was the appropriate collector [mist eliminator]; (2) the pressure drop [mist eliminator] would be .38 inches; and (3) the limit on water droplet size would be 24

microns.[1] Flynn also stated that he felt "a lot better about the velocity and the ▲ P [mist eliminator pressure drop] [which is] more in line with what [Locher] wanted." Swissco purchased the mist eliminators to prevent the water from going into the turbine.

In addition, Locher testified that Munters's sales literature gave him the impression that Munters's representations were accurate. Munters's sales literature stated, "Munters is able to solve your separation problem by choosing the most suitable mist eliminator for the job," and "[u]sing Munters' CAD[2] capabilities, data reflecting actual operating conditions can be quickly generated."

When the products were installed, and the system was tested, the mist eliminators did not work. Testimony showed that "it was like it was raining." The droplet size was visible, and the pressure drop did not meet Harbor's requirements. In the end, the Swissco system failed its test.

### b. Puffing

■ Munters contends that Flynn's statement can only rise to the level of an opinion or "puffing." The DTPA does not mention "puffing" as a defense. However, the Texas Supreme Court has recognized that "mere puffing" statements are not actionable under section 17.46(b)(5). *Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex.1980). Courts have generally considered three factors in determining whether a statement is actionable or mere puffing or opinion. *Hedley Feedlot*, 855 S.W.2d at 839.

■ First, the court must examine the specificity of the alleged misrepresentation. *Id.* (citing *Autohaus v. Aguilar*,

794 S.W.2d 459, 462 (Tex.App.-Dallas 1990), *writ denied per curiam*, 800 S.W.2d 853 (Tex.1991)). An imprecise or vague representation constitutes a mere opinion. *Id.* Although general or indefinite statements may support recovery under the DTPA, they must be examined in light of the particular facts of the case. *Id.* (citing *Autohaus*, 794 S.W.2d at 464).

■ Second, courts compare the knowledge of the buyer and the seller. *Id.* (citing *Autohaus*, 794 S.W.2d at 463). Superior knowledge of a seller, in conjunction with the buyer's relative ignorance, operates to make the slightest divergence from mere praise into representations of fact effective as a warranty. *United States Pipe & Foundry Co. v. City of Waco*, 130 Tex. 126, 108 S.W.2d 432, 436–37 (1937).

■ Finally, the courts look at whether the representation pertains to a past or current event or condition, or to a future event or condition. *Hedley Feedlot*, 855 S.W.2d at 839. Misrepresentations concerning future conditions or performance of a good or service are actionable under the DTPA. *Smith v. Baldwin*, 611 S.W.2d 611, 615–16 (Tex.1980). A general statement concerning a future event, however, should be looked at differently than a statement concerning a past or present event or condition. *Autohaus*, 794 S.W.2d at 464.

■ Flynn represented that the T–130 demister was the appropriate collector and that the water droplet size would be 24 microns. The evidence showed that the mist eliminators did not work as he represented. These statements were not generalizations that are usually held to amount to mere opinion or puffing. *See Bradford v. Vento*, 48 S.W.3d 749, 759 (Tex.2001)

---

**1.** Water droplet size of 24 microns cannot be seen by the naked eye.

**2.** Computer aided design.

(holding that the statement that defendant would "take care of" plaintiff in January was simply too vague and thus, nonactionable); *Douglas v. Delp,* 987 S.W.2d 879, 886 (Tex.1999); *Autohaus,* 794 S.W.2d at 464–65. Rather, the statements made in the present case were specific representations about which mist eliminator would be appropriate, and how that particular mist eliminator would perform in the future. The evidence further indicated that Munters possessed superior knowledge about the performance capabilities of this product. Accordingly, after considering all the evidence, we conclude that Swissco presented legally and factually sufficient evidence of a misrepresentation of material fact.

### c. Misinformation

Munters also argues that it could not have made a misrepresentation because Swissco provided misinformation about the design. Specifically, Munters asserts that because Locher's March 11 fax stated that velocity would equal 1082 feet per minute, and later test results showed that the velocity went as high as 6000 feet per minute, Munters could not have misrepresented the benefits of its demister.

At trial, Flynn testified that he had multiple conversations with Locher about the velocity of air traveling through to the turbine. Flynn stated, "I explained to Mr. Locher that all of the figures which I had given him were dependent upon the gas—in this case air—being distributed across the inlet face of the mist eliminator within plus or minus 25% of average." He further stated that the "average value is what I had taken from Mr. Locher's number here of 1138 feet per minute" and "all my answers were precluded upon the airflow being within this plus or minus 25%." He also testified that he told Locher over the phone that, "we would not under any circumstances take responsibility for gas flow

being within plus or minus 25%." Flynn agreed that he was aware that air velocities could be higher than those in the March 11 fax, but only by plus or minus 25%.

Locher testified that his calculations in the March 11 fax were what he hoped the velocity of air would equal. He was not sure of the velocity of air; and that is why he wrote the March 11 fax to Flynn. He believed that Flynn would know the correct velocity because Munters had stated that it had the capabilities to design and make those calculations. He also testified that he sent the March 11 fax because he was "trying to see if Munters' product would work in this arrangement and if so, what results we could expect from Munters, from the system, because I didn't have the expertise."

The trial court heard conflicting testimony from Locher and Flynn. In reviewing the evidence, we accord due deference to the trial court, which, as the trier of fact presented with conflicting testimony, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Southwestern Bell Media, Inc.,* 825 S.W.2d at 493. As the sole trier of fact, the trial court is free to believe one witness and disbelieve others; the court may resolve inconsistencies in a witness's testimony. *Id.* Here, the trial court could have believed Locher's testimony that he sent the fax in order to discover if the mist eliminator would work under the conditions presented and if velocity would be a problem. We conclude that the trial court's rejection of Munters's defense is supported by sufficient evidence.

We overrule Munters's first issue.

### d. Producing Cause

In Munters's second issue, it asserts that the evidence is legally and factually

insufficient to show that its misrepresentations, if any, were the producing cause of Swissco's injuries. Specifically, it challenges the legal and factual sufficiency of the evidence to support the trial court's conclusions of law 2 and 5 and the trial court's findings of fact 31, 32, 33, and 34.

 In its conclusions of law, the trial court held:

(2) Munters' violation of the DTPA was a producing cause of Swissco's failure.

(5) The evidence shows that Swissco, due to Munters' violation of the DTPA, lost specific, ongoing profitable contracts, that new contracts from former Swissco customers were serviced by the company Mr. Locher worked for after Swissco's failure, and that such contracts likely would have gone to Swissco had Swissco not failed.

In its findings of fact, the trial court found:

(31) Swissco's bankruptcy was caused by the false representations made by Munters regarding the mist eliminators.

(32) Because of its two-decade history of profitability, it is likely, had the false representations not been made, Swissco would have continued to be a profitable company.

(33) As a result of the false response, Swissco lost $974,866.02 in profits.

(34) Swissco, due to the failure, lost specific, ongoing, profitable contracts, and new contracts from former Swissco customers which were serviced by the company Mr. Locher worked for after Swissco's failure, which contracts likely would have gone to Swissco had Swissco not failed.

To recover under the DTPA, the plaintiff must show that the defendant's actions were the "producing cause" of actual damages. *See* Tex. Bus. & Com.Code Ann. § 17.50(a) (Vernon Supp.2002). This showing requires some evidence that the defendant's act or omission was a cause in fact of the plaintiff's injury. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 481 (Tex.1995). Under this standard, it is not necessary to show that the harm was foreseeable. *Id.*

 Locher testified that he would not have purchased Munters's products had Flynn stated that his calculations on pressure drop and limit drop were only good under certain gas distribution conditions. As analyzed in the first issue, the evidence showed that Munters misrepresented the quality of its products, and that Munters's misrepresentations prevented Swissco from meeting its contractual obligations with Harbor. Thus, Swissco did not get paid by Harbor. Therefore, Swissco suffered actual damages flowing from the misrepresentation of Munters.

Justin Nagesh, Swissco's accountant, described Swissco as a healthy company, with revenues of half a million to two million dollars. Swissco never bounced a check, always paid its taxes timely, and never missed a payroll. When the Harbor contract was terminated, Swissco lost more than $200,000 on the project, and it was unable to pay major suppliers. Swissco lost two months worth of revenue, and suppliers placed Swissco on COD status. He opined that Swissco's failure and bankruptcy was a result of not being able to collect the $315,000 payment from Harbor.

Munters's expert, Robert Barr, generally did not agree with Swissco's expert. Barr testified that losing the Harbor contract could not have been the sole reason for entering bankruptcy. He testified that Swissco was financially insecure even before Munters shipped the products. He concluded that losing the Harbor contract was only one factor precipitating Swissco's bankruptcy.

■ Here, the evidence showed that Munters misrepresented the quality of its products. Because the products did not perform as expected, Swissco could not satisfy the performance requirements of the contract. As a result, Harbor paid nothing to Swissco. The trial court then heard conflicting testimony about what caused Swissco to declare bankruptcy. As the sole finder of fact, the trial court was free to believe Nagesh's testimony that the loss of the Harbor contract caused Swissco to declare bankruptcy. After reviewing all the evidence, we conclude that Swissco presented sufficient evidence on producing cause.

We overrule Munters's second issue.

### e. Damages

In Munters's third point of error, it argues that the evidence was legally and factually insufficient to support the trial court's conclusions of law 3, 5, and 6 and finding of fact 33.

■ In its conclusions of law, the trial court concluded that:

(3) The evidence supports Swissco's recovery of lost profits of $974,868.02.

(5) The evidence shows that Swissco, due to Munters' violation of the DTPA, lost specific, ongoing profitable contracts, that new contracts from former Swissco customers were serviced by the company Mr. Locher worked for after Swissco's failure, and that such contracts likely would have gone to Swissco had Swissco not failed.

(6) Swissco proved its lost profits with reasonable certainty by one complete calculation.

In its findings of fact, the trial court found:

(33) As a result of the false responses, Swissco lost $974,866.02 in profits.

Recovery for lost profits does not require that the loss be susceptible to exact calculation. *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex.1994). The injured party must do more, however, than merely show that it suffered some lost profits. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994). The loss amount must be shown by competent evidence with reasonable certainty. *Id.* This is a fact-intensive determination. *Id.* At a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained. *Id.*

Nagesh testified about Swissco's lost profits. Swissco's exhibit 39 details Nagesh's opinion on the value of the loss of income and business that it lost between the time Swissco filed for bankruptcy and when it started building up the new business. Nagesh concluded that in total, Swissco lost $1,911,000 in profits. This amount was based on the discounted value of the loss in income and the discounted value of the terminal value of the company. The loss in income occurred between 1991 to 1999. For each year, Nagesh used an amount of income that the company would have lost and discounted it. These amounts were also based on forecasted cash flow from historical data. The terminal value of the company was the amount of money that the company could be sold for. In making these calculations, Nagesh used a 10% discount factor. Nagesh testified that the discount factor is determined by the subjective intent of the accountant.

Locher also testified about lost profits. While he worked for CPI,[3] Locher testified that there were at least five projects that

---

**3.** CPI took over Swissco's clients. Locher continued to service customers in the com- mercial air filter industry with gas turbine needs.

would have been handled by Swissco had it remained in business. One specific contract was for Dow Chemical, in which Swissco supplied approximately $300,000 to $500,000 in air filters a year. Further, Swissco had been doing business since 1969.

Munters's expert, Robert Barr, disagreed with Nagesh's valuation report. Barr testified that Nagesh's numbers used for his conclusion were unreliable. The methods that Nagesh used were not in compliance with generally accepted accounting principles. In 1991, Barr did not believe that Swissco was a profitable company. Barr also testified that the discount factor should have been somewhere in the twenties, and that the estimate on future profits beyond five years was pure speculation.

██ We conclude that Swissco presented sufficient evidence on lost profits. Swissco's accountant gave his opinion on lost profits based on objective facts, figures, and historical data. Locher also testified about contracts that Swissco lost after it declared bankruptcy. Moreover, the trial court heard conflicting testimony about Swissco's lost profits and the underlying data used to calculate the amount. As the sole finder of fact, the trial court was free to believe that Nagesh gave a reasonably certain estimate on lost profits, while disbelieving the testimony of Barr. *Southwestern Bell Media, Inc.*, 825 S.W.2d at 493. Accordingly, after reviewing all the evidence, we conclude that Swissco presented legally and factually sufficient evidence on damages.

We overrule Munters's third issue.

## Conclusion

We affirm the judgment of the trial court.

Justice MIRABAL dissenting.

MARGARET GARNER MIRABAL, Justice, dissenting.

I am persuaded by appellant's motion for rehearing that, in our original opinion, we overlooked a material, uncontroverted, and determinative fact: appellant's specific representations about the de-misters were in response to inaccurate specifications provided by appellee.

The majority opinion on rehearing continues to hold that, by the representations in its March 12, 1991 fax, appellant made specific material misrepresentations that were actionable under the DTPA. I disagree.

Appellee was in the business of designing and installing custom cooling systems. Appellee purchased from appellant a $50,000 component part to be installed in the $300,000 custom cooling system appellee was assembling for its customer in California. It is uncontroverted that appellee decided to purchase the T–130 component part from appellant based on appellant's response to appellee's March 11, 1991 faxed inquiry, which reads:

> Attached is a new arrangement for the placement of the de-misters. Since the former arrangement is so limited we have chosen to move the system into the duct work. Please review and respond as to the pressure drop and if we will have a problem with turbulence.

The attachment is a diagram showing the placement of the de-misters in the duct work, and specifying that air velocity through the de-misters would be 1,082 feet per minute (about 12 miles per hour).

In response, by a March 12, 1991 fax message, appellant replied:

> Subject: Revised mist elimination proposal
>
> Message:

Engineering has given their approval of the idea of using the bottom portion of the module as a drain box for the application. We now offer the modules with a closed bottom, fitted with drain couplings—suitable for stacking one on another. I have re-sized the modules to put the 9″ previously elevated to the drain box into module face area to reduce DP. . . .

We confirm that carry over from Plasdek will be significant at 870—900 feet per minute but droplets will be coarse. A T–130 is an appropriate collector.

I want to be sure that you have considered any possible reduction in performance due to the high velocity through the Plasdek and strategies for keeping the water in the media. If I can help please let me know.

I hope that this helps. I feel a lot better about the velocity and the [mist eliminator pressure drop] is more in line with what you wanted. Let me know how I can help.

When appellee installed the de-mister provided by appellant into the custom cooling system and then tested the system, it was discovered that air velocities around the de-misters were as high as 6000 feet per minute (about 68 miles per hour) rather than the 1082 feet per minute (about 12 miles per hour) that had been specified by appellee. Because de-misters do not operate at such high air velocities, they were ineffective and the custom cooling system built by appellee therefore did not meet the performance requirements of its customer.

The majority opinion holds that appellant's March 12 "revised mist elimination proposal" constituted a misrepresentation of a material fact, even though there was no evidence of how the custom cooling system would have performed if appellee's March 11 specifications had been correct. If the air velocity around the de-misters would have been about 12 m.p.h. rather than 68 m.p.h., the de-misters may well have operated as appellant represented they would.

The March 12 proposal from appellant, responding to misinformation from appellee, was not shown to be a "false, misleading, or deceptive act" by appellant. Accordingly, I would sustain appellant's first issue.[1]

We should reverse and render judgment for appellant.

1. I agree with the majority opinion that the general statements in appellant's sales literature did not constitute actionable misrepresentations under the DTPA. In its brief appellee acknowledges: "The sales literature itself is not the core of the DTPA violation. . . . The statements in the sales literature simply provide the context and background circumstances that must be taken into account when one reads the misrepresentations in the March 12 fax."