HARTFORD FIRE INSURANCE COMPANY, Appellant,

v.

C. SPRINGS 300, LTD., Appellee.

No. 01–06–00065–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 16, 2009.

Bridget Chapman, James D. Cupples, Williams, Cupples & Chapman, L.L.P., Byron C. Keeling, Ruth Brett Downes, Keeling & Downes, P.C., Houston, TX, Christian J. Ward, Gregory S. Coleman, Yetter, Warden & Coleman, L.L.P., Austin, TX, James H. Moody, III, Quilling, Selander, Cummiskey & Lownds, P.C., Dallas, TX, for Appellant.

James E. Doyle, Kathleen Cynthia Pickett, Marianne Monir Ibrahim, Michael D. Robbins, Doyle, Restrepo, Harvin & Robbins, LLP, Jonathan B. Smith, Macey Reasoner Stokes, Baker Botts L.L.P., Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

SHERRY RADACK, Chief Justice.

On this date, the court considered appellee's motion for rehearing and motion for en banc reconsideration. We deny the motion for rehearing, but withdraw our opinion and judgment of May 29, 2008 and issue this opinion in their stead. As we have issued a new opinion, we dismiss appellee's motion for en banc reconsideration as moot. *See Brookshire Bros. v. Smith*, 176 S.W.3d 30, 40 n. 2 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (supp. op. on reh'g).

The issue in this case is whether a three-sentence letter from a company in the business of issuing performance and payment bonds on construction projects creates an obligation on the part of the company to issue $17 million in bonds in connection with a construction project, or whether the letter was a "bondability letter" indicating to the owner of the construction project that its chosen builder had the necessary relationship with the company to obtain such bonds. We also consider whether the owner of the construction project can recover for fraud based on the same letter. We reverse and render.

## BACKGROUND

### The Vineyards construction project

Appellee, C. Springs 300, Ltd. ["C. Springs"] is a limited partnership that was formed to construct, own, and operate an apartment complex in Colorado Springs, Colorado called "The Vineyards." C. Springs planned to finance The Vineyards as a "HUD transaction," meaning that its mortgage would be insured under a U.S. Department of Housing and Urban Development program.

On July 5, 2000, C. Springs selected Williams Company, a Houston contractor, to build The Vineyards. Having selected a contractor, C. Springs applied to HUD for HUD-guaranteed financing. On August 1, 2000, HUD issued a deficiency letter to C. Springs indicating that the application was incomplete. Among other things, HUD requested "an assurance of completion" from the contractor, Williams, by August 11, 2000.

C. Springs contacted Williams about obtaining the required information, and Williams, in turn, contacted FG Insurance Services ["FGI"], a Houston company that wrote surety bonds for several major surety companies, including appellant, Hartford Fire Insurance Company ["Hartford"]. Williams and FGI had a pre-existing business relationship.

On August 8, 2000, a Williams employee, Sherry Jett, contacted Kimberly Smith, an administrative assistant to Richard Heidbrink, an agent for FGI, and explained that Williams needed FGI to send a letter to C. Springs to show that Williams was a bondable company. After making some changes to a letter that Williams had used before, Smith received permission from Heidbrink to sign the letter as Hartford's attorney-in-fact.

### The August 8, 2000 letter

The August 8, 2000 letter referenced "Vineyards at Colorado Springs Apartments" and provided in its entirety:

Williams Industries, Inc. is bonded through Hartford Fire Insurance Company which is A+ rated on AM Best. They have a bonding line of credit of $25,000,000 single and $100,000,000 aggregate. Upon receipt of an acceptable contract, Hartford Fire Insurance Company stands ready to issue 100% performance and payment bonds in the full amount of the contract.

After obtaining the August 8 letter, C. Springs and Williams continued toward finalizing a HUD construction contract, which was set to close in mid-December.

### Williams's financial position declines

Because of problems on other construction projects, Williams's financial position began to decline. Williams lost approximately 1 million dollars between August and October 2000. On October 19, 2000, Hartford instructed FGI that it was "suspending all bond support of Williams Industries until further notice." In November 2000, Hartford decided that it would issue no further security bonds to Williams.

On November 7, 2000, a little over a month before the scheduled HUD closing, Williams informed C. Springs of problems securing performance and payment bonds for the project. Williams continued to assure C. Springs that it could work out its problems with obtaining the bonds, and the two parties continued to work toward the December HUD closing. However, on December 4, 2000, Williams informed C. Springs that it was not going to be able to secure the bonds by the end of 2000. As a result, C. Springs and Williams never signed a construction contract. On December 8, 2000, Smith, of FGI, send C.

Springs a letter stating that "an acceptable contract was not received" and "[i]n the absence of a contract and application, Hartford Fire Insurance Company did not issue any bond in connection with the referenced project."

### C. Springs hires another contractor and finishes the project

In late November 2000, after becoming aware of Williams's problem obtaining bonds, C. Springs began negotiating with another contractor, Global Construction ["Global"], to build the project. After Williams informed C. Springs on December 4 that it could not obtain the necessary bonds, C. Springs moved forward with the project using Global as contractor.

Global's insurance broker also sent a letter to C. Springs regarding its ability to obtain the bonds. The letter Global obtained provided, "Naturally, Liberty Mutual Insurance Company would expect that the execution of any final bonds would be subject to a review of the final contract terms and conditions."

In February 2001, C. Springs closed on the HUD contract with Global as its contractor. The contract price was $18.9 million dollars—$1.9 million dollars more than the $17 million dollars C. Springs had planned to pay Williams.

### C. Springs files suit

C. Springs subsequently brought the underlying suit alleging breach of contract against Hartford and fraud against Hartford, FGI, Guaranty,[1] Smith, and Williams. Essentially, C. Springs's petition alleged (1) that the August 8 letter was a contract, which Hartford breached by not later issuing the bonds; and (2) that Hartford, through its agents, had fraudulently mis-

represented to C. Springs that it would issue the bonds.

### The trial and jury verdict

C. Springs settled with Smith, nonsuited Williams, and proceeded to trial against the remaining defendants. Two liability questions were submitted to the jury as follows:

#### Question 1

Did the August 8, 2000 letter from Kimberly Smith to David Steidley constitute an agreement under which Hartford agreed that it would issue 100% performance and payment bonds for the full amount of the contract between Williams and C. Springs, if any, for the construction of the Vineyards project in Colorado Springs?

It is your duty to interpret the following language in the August 8, 2000 letter: "upon receipt of an acceptable contract." You must decide its meaning by determining the intent of the parties at the time the letter was written. Consider all of the facts and circumstances surrounding the making of the letter, the interpretation of the letter by the parties, and the conduct of the parties

\* \* \* \*

\* \* \* \*

Answer Yes or No:

 Yes <u>Yes</u>

 No <u> </u>

#### Question 5

Did one or more of the defendants commit fraud against C. Springs?

Fraud occurs when—

a. a party makes a material misrepresentation

---

1. Guaranty Insurance Services, Inc. is the successor of FGI's bond business. The jury was instructed that "Hartford's conduct includes all conduct by Guaranty, occurring on or after October 1, 2000, that relates in any way to the subject matter of the August 8, 2000 letter."

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion.

c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party relies on the misrepresentation and thereby suffers injury

"Misrepresentation" means:

A false statement of fact or

A promise of future performance made with an intent, at the time the promise was made, not to perform as promised.

A party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise.

\* \* \* \*

Answer Yes or No for each of the following:

| | |
|---|---|
| Hartford | Yes |
| Guaranty | No |
| FGI | No |
| Kimberly Smith | No |

The jury awarded $4,278,117 for the difference between what C. Springs paid and would pay under the contract with Global and what it would have paid under a contract with Williams, including "interest expense" due to a difference in mortgage rates on debt incurred in connection with the project. The jury also awarded $362,345 in lost rentals from the Vineyards and $96, 507 for out-of-pocket expenses incurred by C. Springs. The total damages awarded was $4,736,969. The same measure of damages was awarded for both the contract claim and the fraud claim.

## STATUTE OF FRAUDS

Hartford contends that the trial court erred in denying its motion for instructed verdict and submitting the contract issue to the jury because the August 8, 2000 letter was not, as a matter of law, an enforceable contract. Specifically, Hartford argues that the lack of an essential term causes the contract to fail under the statute of frauds.

*Standard of review*

A denial of a motion for directed verdict may be reversed when the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law, and there is no evidence to the contrary. *See McCarley v. Hopkins*, 687 S.W.2d 510, 512 (Tex.App.-Houston [1st Dist.] 1985, no writ). In reviewing the denial of an instructed verdict, we consider all the evidence in the light most favorable to the nonmovant and disregard all evidence to the contrary. *Harris County v. Demny*, 886 S.W.2d 330, 333 (Tex. App.-Houston [1st Dist.] 1994, writ denied). Every reasonable inference is resolved in favor of the nonmovant. *Id.* If there is any conflicting evidence of probative value on any theory of recovery, the issue must go to the jury. *Cliffs Drilling Co. v. Burrows*, 930 S.W.2d 709, 712 (Tex.App.-Houston [1st Dist.] 1996, no writ).

*Applicable law*

A contract that creates a suretyship must also comply with the statute of frauds. *See* Tex. Bus. & Com.Code Ann. § 26.01(a), (b)(2) (Vernon 2002 & Supp. 2008). To satisfy the statute of frauds, there must be a written memorandum which is complete with itself in every material detail and that contains all of the essential elements of the agreement, so that the contract can be ascertained from the writing without resorting to oral testimony. *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex.1978); *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 594 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

*Does the statute of frauds apply to an agreement to enter a surety contract?*

█ C. Springs, however, argues that the statute of frauds does not apply to the August 8, 2000 letter "[b]ecause the letter binds Hartford only to issue the bonds, not actually to perform in accordance with their terms[.]" Essentially, C. Springs argues that a promise to enter a surety relationship is different from the surety relationship itself. Thus, C. Springs argues that the promise to issue the bonds need not contain all the essential terms of the bonds themselves. We disagree.

██ "A promise to sign a written contract as surety for the performance of a duty owed to the promisee ... is within the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 117 (1981). Similarly, an agreement to make a future contract is enforceable only if it is specific as to all essential terms. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 846 (Tex.2000). A contract to enter a contract covered by the statute of frauds must also meet the statute of frauds. *See Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 635 (Tex.2007) (holding that statute of frauds bars breach of contract claim based on oral promise to enter contract not performable in one year). Thus, the argument that this is a contract to issue the bonds rather than the bond contract itself is irrelevant. The same requirements apply to both.

*Does the letter adequately describe the essential terms of the alleged agreement?*

█ We turn to whether the letter in this case contains sufficient "essential terms" to comply with the statute of frauds, or whether it fails for indefiniteness. The letter in this case provides that, "[u]pon receipt of an acceptable contract, Hartford Fire Insurance stands ready to issue 100% performance and payment

bonds in the full amount of the contract." The letter, however, provides little more information.

█ To comply with the statute of frauds, a memorandum of a guaranty or suretyship must contain (1) the parties involved, (2) a manifestation of intent to guarantee the obligation, and (3) a description of the obligation being guaranteed. *Park Creek Assocs., Ltd. v. Walker,* 754 S.W.2d 426, 429 (Tex.App.-Dallas 1988, writ denied). Hartford argues that the second element—a manifestation of intent to guarantee Williams's obligation—is missing from the August 8, 2000 letter. Specifically, Hartford argues that the letter shows no present intent to be bound, but instead contemplates further actions by the parties. We agree.

█ Under Texas law, a writing that contemplates a contract or promise to be made in the future does not satisfy the requirements of the statute of frauds. *See Martco, Inc. v. Doran Chevrolet, Inc.,* 632 S.W.2d 927, 928–29 (Tex.App.-Dallas 1982, no writ); *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 767 (5th Cir.1988); *Document Imaging, Inc. v. IPRO, Inc.,* 952 F.Supp. 462, 468 (S.D.Tex.1996). Writings that contain "futuristic" language are insufficient to confirm that a contract or promise is already in existence. *Martco,* 632 S.W.2d at 928; *Southmark* 851 F.2d at 767.

The writing in this case provides that, "upon receipt of an acceptable contract," Hartford "stands ready" to issue the bonds. This "futuristic" language clearly contemplates a future contract, and cannot be reasonably construed as reflecting a present intent by Hartford to guarantee Williams's performance. Indeed, the language clearly contemplates that Williams or C. Springs will first provide Hartford

with an "acceptable contract."[2] Second, Hartford's statement that it "stands ready" also indicates that Hartford had no present intent to be bound at the time the August 20 letter was signed. *See Maderas Tropicales v. Southern Crate & Veneer Co.*, 588 F.2d 971, 974 (5th Cir.1979) (holding Southern Crate's letter that it "stands willing and able to purchase all the cleats that (Willimgham) can manufacture" insufficient to comply with statute of frauds because it shows offer to purchase in the future, not present intent to contract).

Because an essential term of the August 8, 2000 letter—particularly, Hartford's intent to guarantee Williams's obligations—cannot be ascertained from the writing, the letter is too indefinite, as a matter of law, to form a binding promise that complies with the statute of frauds. At best, the August 8, 2000 letter shows an agreement to agree at some future date. As such, the ·trial court erred in submitting the breach of contract issue to the jury.

### FRAUD

C. Springs's fraud claim rests on two alleged misrepresentations in the August 8, 2000 letter. We address each respectively.

*Fraudulent inducement*

█ First, C. Springs claims that Hartford misrepresented its willingness to issue the bonds, which, in turn, induced C. Springs into accepting the offer by partial performance. As such, C. Springs's first fraud claim is one of fraudulent inducement. We have already held that the August 8, 2000 letter did not create an en-

forceable contract. Absent an enforceable contract, C. Springs cannot claim that it was fraudulently induced to enter such contract. *Haase v. Glazner,* 62 S.W.3d 795, 798 (Tex.2001).

*Common-law fraud*

Second, C. Springs argues that the August 8, 2000 letter contained a misrepresentation of fact—the amount of Williams's bondability—that C. Springs relied on in moving forward with Williams as contractor. Specifically, the letter stated that Williams had a "bonding line of credit of $25,000,000 single and $100,000,000 aggregate." However, the evidence shows, and Hartford concedes, that this is a "mistake," and that Williams's credit had "never exceeded $10 million for a single job and $85 million aggregate." We address whether this fraud claim (1) was pleaded, (2) is supported by sufficient evidence, and (3) gives rise to the damages awarded on it.

*Sufficiency of pleading on the issue*

█ A trial court cannot enter judgment on a theory of recovery not sufficiently set forth in the pleadings or otherwise tried by consent. *Miller v. Towne Servs., Inc.,* 665 S.W.2d 143, 147 (Tex. App.-Houston [1st Dist.] 1983, no writ); *see also* Tex.R. Civ. P. 301 (providing that the "judgment of the court shall conform to the pleadings"). There are, however, exceptions to rule 301. Unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the plead-

---

**2.** In their briefs, the parties vigorously dispute what is meant by the term "acceptable contract." C. Springs argues that the term refers to a contract that complied with HUD's requirements. Hartford, however, argues that the term refers to a contract that met their underwriting requirements. We need not resolve this issue because, for purposes of deter-

mining whether the August 20, 2000 letter is sufficient to comply with the statute of frauds, we need only recognize that the inclusion of the term refers to an event to happen in the future. Neither party disputes that, at the time the letter was written, no such "acceptable contract" existed under either party's definition of the term.

ings. *See Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 495 (Tex.1991). The party who allows an issue to be tried by consent and who fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal. *Id.* Moreover, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." TEX.R. CIV. P. 67. To determine whether an issue was tried by consent, we examine the record not for evidence of the issue, but rather for evidence of trial of the issue. *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.,* 184 S.W.3d 760, 771 (Tex.App.-Dallas 2005, pet. denied). A party's unpleaded issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating that both parties understood the issue was in the case, and the other party failed to make an appropriate complaint. *Id.*

At the charge conference, Hartford objected to submitting the definition of misrepresentation as a "false statement of fact" because "there are no pleadings to support plaintiff's claim that the reference to Williams's bonding line of credit in the August 8th letter was fraudulent, and the issue has not been tried by consent." The trial court overruled Hartford's objection and submitted the issue to the jury.

The record shows that the issue of Williams's bonding line of credit was raised several times during the trial and supports the trial court's conclusion that the issue was tried by consent.

*Legal and factual sufficiency of the evidence*

Next we turn to whether the evidence is legally and factually sufficient to support the jury's finding that Hartford committed fraud based on its statement in the August

8, 2000 letter that Williams had a "bonding line of credit of $25,000,000 single and $100,000,000 aggregate."

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex. 1983). In deciding whether the evidence in support of the finding amounts to "no evidence," the reviewing court considers only the evidence and inferences tending to support the jury's finding, views that evidence in the light most favorable to the finding, and disregards all contrary evidence and inferences. *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex. 1992); *see City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005) (holding that whether reviewing court starts with all or only part of record, it "must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it," but "if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it"). Thus, "[a] no-evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Merrell Dow Pharm., Inc.,* 953 S.W.2d at 711. "More than a scintilla" of evidence exists to support a jury finding when the evidence supporting the finding, taken as a whole, would enable reasonable and fair-minded people to draw different conclusions. *Id.*

In reviewing the factual sufficiency of the evidence to support a jury finding, the court conducts a neutral review of all the evidence and sets aside the verdict only "if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *see also Minucci v. Sogevalor, S.A.*, 14 S.W.3d 790, 794 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

 To prevail on a fraud claim, a plaintiff must prove that (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied on the representation, which caused injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex.2001). Thus, justifiable reliance and causation are necessary elements of fraud. *Id.*

### a. Justifiable Reliance

 Hartford admits that the August 8, 2000 letter contained a false statement of fact about Williams's bonding line of credit, but argues that there is no evidence, or insufficient evidence, to show that C. Springs justifiably relied on the statement. Specifically, Hartford argues that "C. Springs simply could not have relied on the August 8 letter as an unconditional, unbreakable commitment to issue bonds" because "[n]o one could reasonably believe that such a letter binds a surety to stand ready in perpetuity to issue bonds whenever they are called for, on whatever contract price, under whatever conditions exist at the time." We agree.

Even if the August 8, 2000 letter had not contained a misrepresentation about Williams's bonding line of credit, C. Springs could not have relied on the letter without a representation that Williams would remain bondable. Put another way, the letter does not promise that Williams's credit limit, in whatever amount, will continue past the date of the letter. Absent a promise to lend against the line of credit— a promise that we have already held Hartford did not ˙ make—the amount of Williams's line of credit is irrelevant. Even when a bonding line exists and credit remains on it, a surety is not bound to issue bonds absent an agreement to do so. WILLIAM SCHWARTZKOPF, PRACTICAL GUIDE TO CONSTRUCTION CONTRACT SURETY CLAIMS § 2.04(H) (2007). Because the August 8, 2000 letter does not represent that Williams's line of credit, in either the true or misrepresented amount, would continue to exist into the indefinite future, C. Springs cannot claim to have justifiably relied on any part of the letter in choosing to do business with Williams.

### b. Causation

 To establish the element of causation, a plaintiff must show that the defendant's acts or omissions were a cause-in-fact of foreseeable losses. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex.2003). A defendant's acts or omissions are a cause-in-fact if the plaintiff can show, beyond mere conjecture, guess, or speculation, that an act or omission was a substantial factor in bringing about an injury which would not otherwise have occurred. *Id.* In this case, C. Springs's damages were not caused by the misrepresentation regarding the amount of Williams' bonding line of credit. Instead, C. Springs's damages were caused by the fact that Williams became unbondable in any amount because of its deteriorating financial condition. The misrepresentation in the August 8 letter was not a "substantial factor" in bringing about C. Springs's

injury because, regardless of the amount of the credit line stated in the letter, Williams became unbondable. As such, the misrepresentation in the August 8 letter was not a cause-in-fact of C. Springs's damages.

Because there is legally insufficient evidence to show that C. Springs justifiably relied on the August 8, 200 letter, and that such justifiable reliance caused damage to C. Springs, the jury's fraud findings do not support the damages awarded.

## CONCLUSION

We reverse the judgment of the trial court and render judgment that C. Springs take nothing by way of its claims against Hartford.