**Opinion issued October 23, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00888-CV

———————————

**JIMMY OLANIPEKUN, Appellant**

**V.**

**OSARETIN FRED OMOKARO D/B/A PAMMY DISCOUNT ICE CREAM AND IMAFIDON OSARETIN, Appellees**

On Appeal from the 281st District Court
Harris County, Texas
Trial Court Case No. 2011-18713

## MEMORANDUM OPINION

The trial court entered a take-nothing judgment after ruling that the plaintiff, Jimmy Olanipekun, failed to meet his burden to establish his causes of action, including breach of contract, fraud, and unjust enrichment. In four issues, Olanipekun asserts that the trial court erred by not enforcing a sales contract and

by entering or failing to enter various findings of fact. Neither of the appellees, Osaretin Fred Omokaro (Fred) and Imafidon Osaretin (Ima), filed a brief with this Court. Following submission of the case on only Jimmy's brief, we affirm.

## Background

Jimmy owned an ice cream distribution business named Pammy Discount Ice Cream for approximately 20 years. Jimmy decided to sell the Pammy business and, in connection with those efforts, entered into three separate agreements. The first two agreements were with Ima. The third was with Ima's husband, Fred. There is substantial overlap in the subject of the sales agreements. In the first agreement, executed on November 21, 2006, Jimmy agrees to sell to Ima "real property and improvements" at the Pammy location for $150,000.[1] In the second agreement with Ima, dated November 26, the sales price is reduced to $125,000 "based on appraised value of property."[2] A couple months later, on February 7, 2007, Jimmy and Ima attended a closing. Fred also attended.

Two months after that, the third document was signed. This April 9 agreement contemplates the sale of the Pammy real estate, building, and other

---

[1]  The agreement states that Ima gave Jimmy $10,000 in down payment and $5,000 in earnest money, both to be applied to the purchase price. It listed a closing date of December 15, 2006.

[2]  The second agreement references the $5,000 earnest money payment but not the $10,000 down payment. The agreement states that Jimmy will owner finance $12,500 of the purchase price for three years. The agreement lists a closing date of January 24, 2007, yet also states that it will close no later than January 15, 2007.

2

business assets, including customer lists, trademarks, trade names, logos, business goodwill, and supplies to Fred.[3] The stated purchase price is $250,000, which is broken down into three parts: $125,000 for "land, building, fixtures and improvements," $115,000 for "equipment, intangibles, goodwill," and $10,000 for a non-competition covenant. The agreement states that the transaction "will close on 7th day of February, 2007"—which is the date, two months earlier, that a closing was held.

The parties dispute which of the contracts controlled the sale of the land and Pammy business. Following a two day bench trial, the court entered a final judgment stating that Jimmy "has not met his burden of proof on the causes of action asserted" and ordering that he "take nothing through his claims." At Jimmy's request, the court issued findings of fact and conclusions of law; however, the trial court did not grant Jimmy's request for additional findings. After the trial court denied Jimmy's motion for new trial, he timely appealed.

**Effect of a Sworn Denial of Execution**

In his first issue, Jimmy argues that Rule 93(7) of the Texas Rules of Civil Procedure governing verified denials mandates that the April 9 agreement be enforced against Fred.

---

[3] The agreement provides for a payment to Jimmy at closing of $125,000 and states that Jimmy will owner finance a portion of the sale price and provide a cash advance to Fred of $30,000.

Rule 93(7) provides that a party may deny execution of a written instrument through a verified denial. TEX. R. CIV. P. 93(7). A Rule 93(7) verified denial challenges the authenticity of the document and addresses the document's admissibility as an evidentiary issue. *See Hanks v. NCNB Tex. Nat'l Bank*, 815 S.W.2d 763, 765 (Tex. App.—Eastland 1991, no writ) (stating that failure to file Rule 93(7) verified denial made notes admissible "without necessity of further authentication"); *Roth v. JPMorgan Chase Bank, N.A.*, No. 08-12-00132-CV, 2014 WL 3644285, at *3 (Tex. App.—El Paso July 23, 2014, no pet. h.) (noting that failure to file verified denial waives evidentiary objections). Failure to file a verified denial results in the instrument being received in evidence "as fully proved." *Hanks*, 815 S.W.2d at 765.

Jimmy sued Fred on the April 9 contract, which contained a signature for the "buyer." Fred did not file a verified denial to allege that the signature was not his. Jimmy argues that, under Rule 93(7), the trial court was required to enforce the agreement against Fred because he did not deny executing the contract.

A failure to file a verified denial of execution does not, however, result in enforcement of a contract against its signator as a matter of law. *See Preston State Bank v. Jordan*, 692 S.W.2d 740, 744 (Tex. App.—Fort Worth 1985, no pet.) ("The fact that appellee failed to deny under oath under [Rule] 93(7) that he had executed the contract, does not excuse appellant from having to prove the terms of

the contract."). Even when a party fails to deny execution, the opposing party suing to enforce the agreement still must prove that the document is the instrument that controls the legal transaction, the agreement has been breached, and damages are owed under the agreement. *See Wheeler v. Sec. State Bank, N.A.*, 159 S.W.3d 754, 757 (Tex. App.—Texarkana 2005, no pet.) (requiring proof of all elements of claim to enforce promissory note, even after noting that borrower did not file verified denial of execution); *Cockrell v. Republic Mortg. Ins. Co.*, 817 S.W.2d 106, 111 ((Tex. App.—Dallas 1991, no writ) (absence of Rule 93(7) verified denial resulted in party establishing borrower's signature as matter of law, yet court still required lender to prove status as note holder and that "there was an amount certain due and owing on the notes").

Thus, Jimmy was required to prove all elements of his causes of action, including that the contract was breached and damages were owed by Fred as a result of that breach.

We overrule Jimmy's first issue.

## Proving Contract as a Matter of Law

In his second issue, Jimmy argues that the April 9 agreement with Fred was a "fully proven contract" that "addressed all essential terms of the agreement" and was, therefore, enforceable as a matter of law.

## A. Standard of review

When a plaintiff challenges the judgment entered against him following a bench trial and argues that he established his cause of action as a matter of law, we will apply the same standard of review applicable to the denial of a plaintiff's motion for directed verdict. A denial of a motion for directed verdict may be reversed when the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law and there is no evidence to the contrary. *See Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 777 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (stating standard of review for denial of directed verdict). We consider all the evidence in the light most favorable to the defendants who prevailed at trial and disregard all evidence to the contrary. *See Harris Cnty. v. Demny,* 886 S.W.2d 330, 333 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (stating that, in directed verdict context, evidence is viewed in light most favorable to nonmovant). Every reasonable inference is resolved in favor of the defendants who prevailed. *See id.* If there is any conflicting evidence of probative value on any theory of recovery, the issue is one to be resolved by the fact-finder and the plaintiff who lost at trial has not established his right to enforce the agreement as a matter of law. *See Cliffs Drilling Co. v. Burrows,* 930 S.W.2d 709, 712 (Tex. App.—Houston [1st Dist.] 1996, no writ).

**B.     Evidence regarding which contract controlled**

The parties dispute which agreement controlled the sale of the Pammy business and, relatedly, the amount of money owed to Jimmy under the applicable contract.

Ima and Fred both testified that the November 26 agreement between Jimmy and Ima, which was admitted into evidence, was the controlling agreement and that it was the subject of the February 7 closing. According to Ima, the November 26 contract transferred ownership of the business, land, and related assets to her as of the closing date. Consistent with that testimony, she stated that she "applied for a license to open the business and changed it to [her] name" that same month. According to Ima, she has fully satisfied all of her obligations under that agreement and did so with her separate funds.[4]

Fred testified that he was not a party to the negotiations that occurred between Jimmy and Ima.[5] Neither was he a party to any agreement related to the February 7 closing. He denied that he ever purchased anything from Jimmy.

Although Ima and Fred were married at the time they signed agreements with Jimmy, Ima testified that she and Fred kept their money and assets separate.

---

[4]     Both Ima and Fred testified that they have always kept their money and assets separate—from the time they lived in Nigeria through the present in the United States.

[5]     The trial court expressed difficulty with Fred's testimony, which was given in English instead of his native language.

She testified that she purchased the Pammy business alone, she was the sole owner of the business, and she paid the purchase price with her separate funds. She stated that she has continued to operate Pammy Ice Cream and is solely responsible for its finances.

Jimmy argues that the April 9 contract with Fred controls, he is owed a total of $250,000 under the terms of that agreement, and Fred's breach has resulted in damages of $122,736.33. [6] But Jimmy testified that the February 7 closing was for "Pammy Discount Ice Cream and the land and the equipment." And he admitted, on cross-examination, that he has previously testified at deposition that ownership of the Pammy business was transferred with the signing of the February closing documents. Jimmy explained, however, that he had meant only that the land on which the business was operated and the related equipment had been transferred.

Jimmy testified that both Ima and Fred attended the February 7 closing, but he could not remember whether Ima was the only one who signed the closing documents. He did not offer the closing documents into evidence. When he was asked about such documents, he responded as follows:

---

[6] The trial court also expressed difficulty following Jimmy's testimony. Jimmy, who is also from Nigeria, testified at trial through a certified translator. After he answered a few questions in English, he stated that he was "comfortable" with English and began testifying without the assistance of the translator. When the trial court expressed difficulty understanding Jimmy's testimony, his testimony was halted until the next day to allow time for the translator to return.

Q:      Do you have anything in writing to show this court that you had a contract with the husband and the wife as you have just stated?

Jimmy:  I know I signed a lot of documents.[7]

## C.      The trial court, as fact-finder, decides issue of credibility and fact

Because the record contains various written agreements that are inconsistent with each other, the evidence presents essentially a swearing match between the parties regarding which of the contracts controlled their business dealings.

"In a bench trial, the trial court, as fact-finder, is the sole judge of the credibility of the witnesses. The judge may take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony." *Munters Corp. v. Swissco-Young Indus., Inc.*, 100 S.W.3d 292, 296–97 (Tex. App.—Houston [1st Dist.] 2002, pet. dism'd) (citations omitted). It may believe one witness and disbelieve others. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986). It may resolve inconsistencies in any witness's testimony. *Id.*

This appellate court is not a fact-finder and cannot pass upon a witness's credibility or substitute its judgment for that of the fact-finder, even if there is conflicting evidence that would support a different conclusion. *See Cain v. Bain,*

---

[7]     Without such documents, the trial court was left with three seemingly inconsistent agreements and a dispute between the parties over which was the subject of the February closing.

709 S.W.2d 175, 176 (Tex. 1986). We will not reevaluate the weight and credibility of the evidence and therefore defer to the trial court's role as the exclusive judge of the credibility of the witnesses who explained their transactions. *See Munters Corp.*, 100 S.W.3d at 296; *Shear Cuts, Inc. v. Littlejohn*, 141 S.W.3d 264, 271 (Tex. App.—Fort Worth 2004, no pet.). There is no appellate review from a trial court's decision to find one fact as opposed to another so long as there is some evidence in the record which, if believed, would support the trial court's finding. *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 256–57 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

The trial court's findings state that Jimmy sold the property to Ima on February 7. They further state that, at the time Jimmy and Fred signed their April 9 document, Jimmy "no longer owned the real estate, having already sold it to Imafidon [Ima]." The trial court, as fact-finder, was free to believe Ima's testimony—consistent with admitted document evidence—that she entered into a contract to purchase Pammy and closed on that transaction in February. Based on that finding, the trial court could conclude that Jimmy no longer held title to the assets he attempted to sell to Fred later in April 2007. Giving due deference to the trial court's findings on matters of weight and credibility, we conclude that Jimmy has not met his burden to establish as a matter of law that the April 9 contract was enforceable.

**D.     Whether April 9 agreement was a preliminary agreement**

Related to his contention that he established—as a matter of law—the validity of the April 9 agreement with Fred, Jimmy asserts that any indication in that agreement that the parties contemplated a subsequent, more formal document does not prevent enforcement of the terms that are included in that writing. In support of his argument, Jimmy distinguishes the April 9 agreement from writings discussed in other cases that have been held to be mere "agreements to agree" or preliminary agreements conditioned on future actions and therefore unenforceable.

The trial court did not make a finding that the April 9 agreement—which was the last of three agreements contemplating the sale of the Pammy property—was unenforceable because it was a preliminary agreement. Instead, the court concluded that Jimmy failed to prove that the April 9 document—versus the November 21 or November 26 documents—was the contract by which the Pammy business was sold. Jimmy's argument on enforcement of preliminary agreements does not support his contention that the trial court failed to enforce a contract that was proven as a matter of law.

We overrule Jimmy's second issue.

## Findings of Fact

In his third issue, Jimmy contends that the trial court erred by making findings of fact numbers 11 and 12 "because they were based upon evidence not

11

admitted at trial." Both findings reference an "Exhibit D"; however, no "Exhibit D" was included in the appellate record or admitted at trial. Even if the document referred to as "Exhibit D" was not admitted into evidence and, therefore, could not be the basis for the trial court's findings, we conclude there was no error.

Finding number 11 states that, on February 7, 2007, Jimmy sold the property to Ima and the closing was conducted by Chicago Title Insurance Company. Ima testified on these matters, and her testimony was sufficient to support the trial court's findings without the need to rely on "Exhibit D." Accordingly, we find no error with regard to finding number 11. *See Persons v. Persons*, 666 S.W.2d 560, 564 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (concluding that evidence was wrongly admitted but holding, nonetheless, that trial court did not err in judgment because other evidence supported court's finding).

Finding number 12 states that Jimmy received $74,947.71 at the closing and that the total amount paid was $125,000. That finding also references an "Exhibit D." Jimmy testified that he was paid $125,000. In fact, he stipulated at trial that there was a closing on February 7, 2007 for $125,000. Because other evidence supported the finding made by the trial court that $125,000 was paid, without consideration of unadmitted "Exhibit D," we conclude that the trial court did not err in making that finding. *See id*. Further, the court's finding that Jimmy received

$74,947.71 at closing was not material to the court's judgment; therefore, to the extent that finding was erroneous, it is harmless.

Having overruled Jimmy's complaints regarding findings 11 and 12, we overrule his third issue.

**Failure to Amend or Supplement Findings**

In his fourth and final issue, Jimmy contends that the trial court's judgment should be reversed because the court refused to make additional findings of fact after Jimmy filed a request with proposed findings attached.

In a bench trial, the appellant may request additional findings on omitted elements to prevent them from being deemed on appeal. *See* TEX. R. CIV. P. 298. Rule 298 requires the trial court to issue additional findings of fact and conclusions of law "that are appropriate." *Id.* This requirement has been interpreted to mean that additional findings are required only if they relate to "ultimate or controlling issues." *Dura-Stilts Co. v. Zachry*, 697 S.W.2d 658, 661 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *see Rich v. Olah*, 274 S.W.3d 878, 886 (Tex. App.—Dallas 2008, no pet.) An ultimate issue is one essential to the cause of action that would have a direct effect on the judgment. *Rich*, 274 S.W.3d at 886. If the record demonstrates that the trial judge refused to make such a finding, the presumption of an implied finding is refuted. *Vickery*, 5 S.W.3d at 252.

If the losing party is simply dissatisfied with the court's resolution of disputed fact issues, he may request "additional" or "amended" findings that are contrary to those originally made by the trial court; however, the trial court has no duty to make findings that are unnecessary or contrary to its judgment. *ASAI v. Vanco Insulation Abatement, Inc.,* 932 S.W.2d 118, 122 (Tex. App.—El Paso 1996, no writ). Moreover, the trial court is not required to make additional findings which conflict with the original findings or that are evidentiary. *Id.*; *Hunter v. NCNB Tex. Nat'l Bank*, 857 S.W.2d 722, 727 (Tex. App.—Houston [14th Dist.] 1993, writ denied); *see Rich*, 274 S.W.3d at 886 (concluding that request for additional findings of fact "were not on ultimate or controlling issues, but on evidentiary matters or matters contrary to the court's express findings.").

Jimmy requested additional findings of fact that tracked the provisions of the April 9 agreement with Fred—a contract that the trial court, as the fact-finder, already determined was not the controlling document. These requested findings are evidentiary or are contrary to the court's express findings. Accordingly, the trial court did not err by failing to make the additional findings.

Finding no error on this issue, Jimmy's fourth issue is overruled.

14

## Conclusion

The judgment of the trial court is affirmed.

Harvey Brown
Justice

Panel consists of Justices Massengale, Brown, and Huddle.

15